WALLING, Administrator of Wage and
Hour Div., U. S. Dept. of Labor, v. SIL-
VER FLEET MOTOR EXPRESS, Inc.

No. 828.

District Court, W. D. Kentucky,
Louisville Division.

Sept. 20, 1946.

Edward Morrison, of New York City, for plaintiff.

Medina & Sherpick, of New York City, for defendant.

William S. Tyson, Acting Sol., and Jeter S. Ray, Asst. Sol., both of Washington, D. C., Glenn M. Elliott, Acting Regional Atty., of Nashville, Tenn., George W. Jansen, Supervising Atty., of Washington, D. C., and David V. Manker, Atty., and John L. Young, Associate Atty., both of Nashville, Tenn., all of Department of Labor, for plaintiff.

James E. Fahey and Skaggs, Hays & Fahey, all of Louisville, Ky., for defendant.

MILLER, Circuit Judge.

This action was brought by the plaintiff, Administrator of the Wage and Hour Division, under Section 17 of the Fair Labor Standards Act of 1938, 29 U.S.C.A. §§ 201–219, to restrain the defendant, Silver Fleet Motor Express, Inc., from violating the provisions of Sections 15(a) (2) and 15 (a) (5) of the Act, 29 U.S.C.A. §§ 215(a) (2) and 215(a) (5). Those sections provide that it shall be unlawful for any person to violate the provisions of Section 6 or Section 7 of the Act, which relate to minimum wages and maximum hours, or to violate any of the provisions of Section 11 (c) of the Act which require the making and keeping of records of employees with respect to wages, hours and other conditions and practices of employment. The complaint alleges that the defendant has violated provisions of Section 7 of the Act in failing to pay certain of its employees overtime compensation as required by the Act, and the provisions of Section 11(c) of the Act in failing to make and preserve adequate and accurate records as required by the Act and regulations of the Administrator. The defendant admits that the employees involved are engaged in interstate commerce and are not being paid the overtime compensation required by the Act. It contends, however, that such employees are exempt from the provisions of the Act by reason of Section 13(b) (1) thereof, which provides that Section 7 of the Act shall not apply with respect to any employee with respect to whom the Interstate Commerce Commission has power to establish qualifications and maximum hours of service pursuant to the provisions of

Section 204 of the Motor Carrier Act, 49 U.S.C.A. § 304. The defendant denies the plaintiff's claim that it has violated the record-keeping provisions of the Act.

### Findings of Fact.

The defendant is engaged as a common carrier in the interstate transportation of goods by motor vehicle. It has branches located in six different states, including terminals at Louisville and Middlesboro, Kentucky; Chattanooga, Kingsport, Knoxville and Nashville, Tennessee; Cincinnati and Columbus, Ohio; Chicago, Illinois; Anderson, Columbus, Elwood, Fort Wayne, Indianapolis, La Fayette, Marion, Muncie and Seymour, Indiana; and Birmingham, Alabama. Throughout the system it has six garages which are located at Chicago, Illinois; Indianapolis, Indiana; Cincinnati, Ohio; Louisville, Kentucky; Nashville, Tennessee, and Middlesboro, Kentucky, in which about fifty employees are employed. The Company operates approximately 95 tractors, 184 trailers and 82 pick-up and delivery trucks. Freight is hauled in what is termed a "unit" which is composed of a tractor and a trailer, which are hooked together by means of a connection termed a "fifth wheel." The general office of the Company is located at Louisville, Kentucky.

The defendant's Louisville garage can accommodate ten vehicles at a time for repair work. Twenty-three employees work in that garage. It has a body shop adjoining the garage which can service two or three vehicles at a time. Each garage is staffed with a superintendent or a garage foreman, under whose direct jurisdiction there are mechanics, mechanics' helpers, service mechanics, trailer mechanics, tire mechanics and body mechanics, representing various grades of mechanics in accordance with their expertness. Each mechanic is skilled to be versatile so as to be able to take over the duties of other employees in the shop when such employee may be absent. The Company's maintenance program is divided into six different classifications, as follows: (1) General overhaul work, which is work done on the vehicle itself when mechanical defects develop, consisting of such work as repairing broken crankshafts and pistons. (2) General service work, which consists of repairing less serious mechanical failures, which in most instances are brought to the attention of the maintenance department by drivers of the vehicles by means of daily gasoline and oil card records kept by all drivers. This work includes defective brakes, defective lights, defective steering, defective springs, minor motor failures, improperly functioning carburetors and defective tires. (3) Preventive maintenance program, which includes an A inspection given every seven days, a B inspection given every fourteen days and a C inspection given every six months. These inspections are given by the mechanics, mechanics' helpers and service mechanics and are necessary in order to avoid breakdowns and accidents on the highway. (4) Safety lane program. Even though each trailer and each tractor has been previously inspected, after they are hitched together, they are given a final safety inspection in the safety lanes, through which they pass, in order to be sure that the hitch or connection has been properly made. This includes not only the proper connection of the fifth wheel but also proper connection of the air hose and light wires, which involve the proper operation of the trailer brakes and trailer lights. This inspection also includes inspection of windshield wiper and horn, inspection of transmissions and differentials, and the careful inspection of tires, wheels, lugs and bolts. (5) Tire maintenance. When tractors and trailers are driven into the terminal it is the duty of the tire mechanic to inspect the condition of all tires, lugs, bolts and rims and a notation is made by him with respect to any tire that has been damaged enroute or which should be removed for recapping, or which contains a leaky valve, and such defects are later corrected by replacing the damaged or defective tire with a good one drawn from the Company's stock in its garage. Tire mechanics do both the repair work and the work involved in switching the tires. (6) Trailer repairs and maintenance. Trailer mechanics inspect the wheels, wheel bearings, brakes, springs, axles, and auxil-

iary wheels and the condition of the fifth wheel. Body mechanics inspect the fifth wheel, the upper fifth wheel, all doors, floors, roofs, side panels, rub rails, and moldings. Proper maintenance of the bodies of the trailers is a great contributing factor to the safety of operation. If the doors are not properly fitted and maintained they may fly open and strike objects on the highway. If the body of the trailer is faulty freight may fall through the floor and become engaged in the wheels of the trailer. Defective roofs may cause leaks with resulting damage to lights and to the freight itself. The trailers are first painted silver and are then streamlined with black so that they can readily be seen from a distance. Safety markings are painted on the rear of the trailers which enables them to be seen at great distances both at night and day. Visibility is pronounced due to the combination of colors, in that the silver at night acts as a reflector and the black as an outline. One employee, William Rupple, called a letterer, does all the painting and gives his entire time to such jobs. The work of the body mechanic in the body shop is almost entirely repair work, repairing the defects discovered from the inspections above referred to and damage resulting from accidents. During the period of 1930-1945 only 10 new bodies were constructed. In some instances extensive damage requires extensive repairs or replacements, although some of the more extensive repair work is done by private garages. The majority of the employees' time in the different classifications above referred to is spent in making repairs, such as have been detailed above.

The following employees of the defendant worked for the defendant as indicated in each instance: George Prewitt and Ben H. Stewart—mechanics' helpers; Richard Butler, Harvey Goodman and Allen Richard Schmidt—service mechanics; Richard Dowery, Merrill Fultz and Emil Watts—tire mechanics; William Moore and Lavour Wenning—trailer mechanics; John Klemenz, T. H. McKune, Russell Miller and Ernest Railing—body mechanics. Arnold Meeks worked as a driver for the de-

fendant except during the period of July 8, 1944, to September 22, 1944, during which period he worked in the body shop.

The freight transported by the defendant is loaded on the defendant's vehicles and taken off of its vehicles at its different terminals. Each terminal is in the charge of a terminal superintendent. In the larger terminals he has assistants, one of whom assists in handling the platform work and the city drivers. At each terminal there are in addition to the large tractor-trailer units one or more semi-tractor trailer units or street trucks which are used for city collection and delivery purposes, whose operators are known as city drivers. The city driver superintendent has charge of that work. At the Louisville terminal there is a superintendent of city loaders who has complete charge of the men who operate solely on the platform. He divides these men into crews, each crew being made up of a chief loader and three loaders. He directs the activities of the crew through the chief loader, who has the supervision of the crew. The chief loader and his crew perform the actual work of loading and unloading the vehicles that carry the freight between the cities. The usual procedure in loading is as follows: A trailer is parked at the platform. The chief loader reports to the superintendent of loaders that his crew is ready for an assignment. The superintendent hands him a stack of freight bills for freight which is to be loaded off of the platform on to the highway trailer. The chief loader takes his crew to where the freight is located and through experience knows the type of trailer he is to load. His first duty is to see that the trailer is fit for loading, which he does by walking inside the trailer and examining the floor and the roof, and by ascertaining from the outside that the trailer is resting properly on the pavement and not leaning to one side. He then proceeds by checking his freight bills and loading the trailer evenly from the front to the rear, distributing the freight as evenly as possible. An improperly loaded trailer can cause an accident on the highway. Heavy freight should be placed on the bottom and light freight on top. If too much freight is loaded on one side the

trailer will lean to that side and may blow a tire in going around a curve. If too much weight is placed in either the nose or the rear of the trailer it causes difficulty in steering the tractor with resulting danger to the safe operation of the tractor-trailer unit on the highway. The chief loader has complete say as to where the freight is to be placed in the truck, but during the loading of the truck the loaders constantly advise the chief loader as to how the trailer is loading, what freight in their opinion should be loaded next, or whether they want floor freight or top freight. The chief loader generally selects a member of his crew to act as his assistant. Loaders will at times advise that certain freight is not fit for loading or is too heavy or that it should not be placed on the particular side of the truck. The chief loader and his assistant watch for dangerous shipments or shipments that are improperly packed, such as a leaking drum of paint which could drip out and make the road slippery. At times it is necessary that the chief loader and the assistant give assistance in loading heavy merchandise into the truck. Some times a trailer will be loaded with freight part of which goes to a certain city and the remainder of which goes through that city. This may require a rearrangement of the freight in the trailer at the terminal where part of the freight is to be unloaded. Such work is under the supervision of the chief loader and his assistant. Such rearrangement is necessary for the safe operation of the trailer, so that the freight remaining on the trailer can be evenly distributed. The unloading of freight at a terminal is also done by such a crew. The chief loader has supervision of unloading and advises the loaders where the freight is to be placed, some of it being placed in the terminal and some of it at times being placed on a pick-up truck to be taken to another unit that is outbound to another terminal. At times the crew will unload one trailer and also load some of the freight on to another trailer. In the Louisville terminal approximately 50% of the tonnage of freight handled is outbound freight and approximately 50% of the tonnage is inbound freight. The chief loaders are also called at times checkers. The

assistant chief loaders are sometimes called breakers, stackers, and pullers. The two loaders are also called wheelers, in that they also operate the 2-wheel trucks trucking the freight into the warehouse from the incoming trucks and trucking it into the outbound trucks. The Company has no employees who do nothing but load. At the Louisville terminal the Company operates two crews that start at 8:00 a. m. and work until 5:30 p. m. Another crew starts at 10:00 a. m. and works until about 7:30 p. m. The crew works as a unit in loading a trailer, and all of the crews work as a unit in handling what comes in and goes out of the terminal each day. There is no routine or settled custom determining how much time in any particular day any crew will give to loading and how much time it will give to unloading. Sometimes a whole day may be spent by a crew in loading. At other times the crew may spend a whole day unloading trucks when such trucks are immediately needed for other purposes. On the whole, the loaders in the early crews spend approximately 25% of their time in loading, and the remainder of their time in wheeling and unloading, while the loaders in the later crews spend the majority of their time in loading.

The Company also employs men at the Louisville terminal known as yard drivers whose duty it is to park trailers, drop them at the dock or hook up road equipment to trailers. The assistant terminal superintendent will tell a yard driver that a certain trailer is ready to be hooked to a certain tractor. The yard driver then goes to the garage and ascertains that the tractor is ready for the highway. It is part of his duty to lubricate the fifth wheel when he obtains the tractor from the garage. He then hooks the tractor to the trailer making the necessary brake hose connections and the light connections, pulls it away from the platform, closes the rear doors of the truck and applies the seal. He then pulls the complete unit out of the yard and around the city streets to the safety lane, which necessitates driving on the city street approximately a city block. In driving the unit to the safety lane it is also his duty to notice whether or not anything appears radically

wrong with the loading of the truck. About 50% of a yard driver's occupied time is spent in driving on city streets. It takes him about five minutes to drive from the company property and go out on the city streets and then come back into the safety lane.

The defendant employs approximately 35 men on the dock at its Louisville terminal. George W. Streckfus is superintendent of the Louisville terminal and has C. B. Graves as the assistant terminal superintendent. Directly under Streckfus and Graves there are two superintendents of loaders, Geisler and Cannon. Edward Gibson, Chester Graves, K. Krumpleman and Walter Wilkerson are chief loaders. J. T. Baumgartner, Richard Browning and Harvey J. Curtis are yard drivers. John Corcoran, Frank Estis, K. Geisler, K. Rocpey and Wesley L. Stevens are city drivers, otherwise known as C and D (collection and delivery) drivers. M. Burge, B. Camfield, J. Cronan, Sam Hecht and William Thurman are loaders and chief loaders. W. Combs, James Edwards, Willis Froman, James R. Gaither, Fred Graves, William E. Huddleston, Charles Keller, L. K. Louderback, George Malone, William Shaw, Edwin Stiles, John A. Zumer, James Baum, Martin Evans, B. Jarboe, C. A. Leake and B. V. Pearson are loaders. J. Francis worked as a driver part of the time and as a loader part of the time. An employee, George Hoke, spent practically all of his time as a janitor for the dock, terminal and office, from the start of his employment on June 10, 1943, until about April 19, 1945, at which time his duties were changed so as to work four of his nine hours a day on the dock. His work on the dock consists of loading, unloading, wheeling, and as a driver's helper, with no definite allocation of time to any or each particular type of work. Lewis Strain formerly worked as a wheeler and loader, spending three-fourths of his time on incoming freight and one-fourth of his time on outgoing freight and in the warehouse. Approximately an hour a day was spent by him in actually stacking freight in the outgoing trucks. Shortly before the trial, his duties were changed, at his own request, to those of a night watchman.

The defendant makes and keeps the following records for its employees subject to the provisions of the Act: (1) A time card which shows the full name of the employee, the occupation in which he is employed, the time of day and the name of the day on which the employee's work week begins, the hours worked each day and the total hours worked each work week. (2) The information shown on these time cards is summarized upon a weekly payroll report. From the time card just described the Company transfers the regular and overtime hours, the regular and overtime rates and the total earned compensation to a weekly payroll report called Form A-45. That report shows the gross earnings, the social security number, payroll deductions, job classification, the net earnings and the check number. (3) Payroll for extra or casual labor. The Company employs at each terminal at times certain men for extra or casual labor that are employed for that day only. These men are paid at the close of that day or the next morning. Such men may work for merely one day, and then skip a day, or at times they may work for two or three days before skipping a day or so. This payroll is in the same form as the regular payroll report, except that it applies to only one day, while the other report previously referred to applies to the period of a week. This report shows the employee's name, his social security number, his job classification, total hours worked separated between regular hours and overtime hours, rates of pay for the respective divisions of hours and the gross earnings for overtime and for regular time. Then the deductions are shown, then the net amount of earnings together with the check number. This daily payroll report contains as much information concerning one employee for one day as the weekly reports show for the full week. These daily payroll reports for extra or casual labor are not summarized or totalled at the end of the week. As a general rule, such casual employee would be carried on the daily report only while he continued to be a casual employee, and if his employment became regular or continuous his name would then be transferred to the weekly payroll report. In

some few instances, however, casual employees who worked continuously over a period of several months were nevertheless carried on the daily payroll report as casual employees for that period of time. (4) Job classification cards. These cards show the name and location and job classification, rates of pay and reasons for changes in rates of pay of all office and supervisory employees. (5) Personnel cards on all employees including casual labor showing the name, address, job classification, date of birth and additional personal information. (6) Form A-6 known as the temporary and part-time employment application, showing the name, address, social security number and other personnel information which is used for casual or extra labor. (7) Payment checks, which carry a lower stub which the employee tears off and keeps for his permanent records, and which shows both his net earnings and his deductions, including the withholding tax.

The weekly payroll report (Form A–45) was changed for the work week of October 26, 1940, so as for the first time to show for office employees the division between regular hours and overtime hours, regular and overtime rates, and regular and overtime gross earnings. This change promptly followed the final ruling of the Supreme Court of October 14, 1940, that the exemption provisions of the Wage and Hour Law was restricted to those whose work affected the safety of operation of the motor vehicles, and did not include the office employees. Prior thereto the question was in considerable doubt, the United States District Court for the District of Columbia having ruled that the exemption provisions included all employees. In April 1941 a new form was devised to better carry that information. In October 1941 the form was again revised for better arrangement and spacing.

The plaintiff and defendant have stipulated the names of 55 employees of the defendant who the plaintiff claims are paid in violation of the provisions of the Fair Labor Standards Act. Under this stipulation other employees are not involved in this action. The foregoing findings include 53 of the 55 employees so named. The Court has not found any evidence relating to the duties of the other two employees, namely, W. Johnson and Carl R. Jackson.

## Conclusions of Law.

Section 13(b) (1) of the Fair Labor Standards Act, 29 U.S.C.A. § 213(b) (1), provides that the provisions of Section 7 of the Act, 29 U.S.C.A. § 207 dealing with maximum hours and overtime compensation "shall not apply with respect to (1) any employee with respect to whom the Interstate Commerce Commission has power to establish qualifications and maximum hours of service pursuant to the provisions of section 204 of the Motor Carrier Act of 1935; * * *." Section 204 of the Motor Carrier Act of 1935, 49 U.S.C.A. § 304, reads as follows:

"It shall be the duty of the Commission— (1) To regulate common carriers by motor vehicles as provided in this part, and to that end the Commission may establish reasonable requirements with respect to continuous and adequate service, transportation of baggage and express, uniform system of accounts, records, and reports, preservation of records, qualifications and maximum hours of service of employees, and safety of operation and equipment."

In United States v. American Trucking Ass'ns, 310 U.S. 534, 60 S.Ct. 1059, 1062, 84 L.Ed. 1345, the Supreme Court construed the scope and coverage of Section 204 of the Motor Carrier Act and held that it was "limited to * * * those employees * * * whose activities affect the safety of operation" and that the Interstate Commerce Commission had no jurisdiction to regulate the qualification or hours of service of any other employees. It is conceded by the parties in this case that the employees involved are subject to the wage and hour provisions of the Fair Labor Standards Act unless they are exempt by reason of Section 13(b) (1) of that Act, referred to above. In order for these employees to be exempt it follows from the foregoing Supreme Court decision that their activities in their employment by the defendant must affect the safety of operation of defendant's vehicles. The ques-

tion of what activities of employees of interstate motor carriers affect the safety of operation and what activities do not affect the safety of operation has received considerable judicial consideration. The question was considered by this same Court and the same Judge thereof in the case of Keeling v. Huber & Huber Motor Express, D.C.W.D.Ky., 57 F.Supp. 617, 619. In that case the Court referred to several decisions from other districts which held that the activities of the following classes of employees affected the safety of operation, namely, drivers, drivers' helpers, loaders, and mechanics who actually perform work on trucks such as inspecting and repairing lights, brakes, transmissions, differentials, motors and steering apparatus, while on the other hand the activities of the following classes of employees were not such as affected the safety of operation, namely, washing of trucks, the unloading of freight at a trucking terminal, and the moving of it by handcarts to outgoing trucks, tarpaulin worker, porter, stockroom boy, night watchman, and employees engaged in repairing used or damaged bodies on trucks and trailers. It was also there stated that the fact that an employee is a carpenter or mechanic by trade is not decisive but the true test is what the particular employee actually does rather than what he may be qualified to do. The different classes of work referred to in that opinion were not actually involved in that case, and the case must accordingly be considered as a discussion of the authorities and their respective rulings rather than as a ruling in itself.

My present further consideration of the question leads to the conclusion that such rulings are largely correct and to that extent should be followed in this case, although some of the activities included in the exemption were not originally contemplated by the Supreme Court. In United States v. American Trucking Ass'ns, supra, the Supreme Court held that the word "employee" as used in Section 204(a) of the Motor Carrier Act was not to be construed in its broadest meaning, but should take its color from its surroundings. Its

legislative history is cited as showing a construction of the word limited to "matters of movement and safety only" and "careful operation for safety on the highways." In its later opinion in Southland Gasoline Co. v. Bayley, 319 U.S. 44, 63 S. Ct. 917, 87 L.Ed. 1244, the Supreme Court apparently assumed, but without so ruling because the question was not involved, that the power of the Interstate Commerce Commission was limited to the regulation of hours of drivers. The opinion on page 48 of 319 U.S., on page 919 of 63 S.Ct., refers twice to maximum hours for drivers and then expressly states that the exemption provision of the Fair Labor Standards Act "was adopted to free operators of motor vehicles from the regulation by two agencies of the hours of *drivers* (italics our own)." See pages 48 and 49 of 319 U.S., pages 919, 920 of 63 S.Ct. This same thought was expressed in the opinion of the Court for the Second Circuit in Walling v. Comet Carriers, 151 F.2d 107, at page 111, where it said that the power of the Interstate Commerce Commission to limit maximum hours was "obviously intended to prevent accidents due to fatigue." But it is quickly recognized that other activities have just as important effect on the safety of operation of a vehicle on the highway as does the driving of the vehicle in question. The proper mechanical functioning of the vehicle when in operation is vitally important. Failure of brakes, lights or steering apparatus to function properly are just a few instances of what may cause a serious accident on the highway. Proper loading of the trailer with resulting proper balance and proper connection with the tractor by means of the fifth wheel have a direct causal connection with the safe operation of the vehicle. The Interstate Commerce Commission in considering the question after the ruling in United States v. American Trucking Ass'ns, supra, ruled that mechanics and loaders were included within the exemption. See Report, Maximum Hours of Service of Motor Carrier Employees, 28 M.C.C. 125, 132, 133. As pointed out by the Supreme Court in the American Trucking Associations case, such

an interpretation is entitled to great weight. 310 U.S. 534 at page 549, 60 S.Ct. 1059 at page 1067, 84 L.Ed. 1345. The Administrator of the Wage and Hour Division has apparently agreed with and adopted that ruling. See Interpretative Bulletin No. 9, Revised October 1943, Par. 4. I accordingly rule that drivers (including yard drivers and C and D drivers), drivers' helpers, mechanics, and loaders perform work which directly affects the safety of operation and are exempt from the provisions of the Wage and Hour Law. Loaders include the chief loader, assistant loader and loaders, in that the crew works as a unit and the supervision and overall inspection and approval of the work rest upon the chief loader and assistant loader. However, the work of unloading, wheeling and working in the warehouse has no direct connection with the safety of operation, and such work is not included within the exempt provision. I see very little difference between inspection and proper maintenance of the tractor and motor and the inspection and proper maintenance of the trailer where such work remedies defects which have a direct causal connection with the safe operation of the unit as a whole. Accordingly, the work of trailer mechanics and body mechanics in inspecting trailers and repairing such defects thus discovered as might normally result in an accident on the highway if not discovered and repaired, and the proper maintenance of the trailers to prevent such defects from coming into existence, also have a direct causal connection with the safety of operation and are within the exempt provision. But the building of new bodies, the rebuilding of badly damaged bodies, and any work which is construction rather than maintenance and repair are not within the exempt provision. The work of the painter and letterer is, in my opinion, too indirectly connected with the safety of operation to be included within the exempt provision. Keeling v. Huber & Huber Motor Express, supra.

Proceeding on the basis of the foregoing rulings, there is still presented the question of whether or not an employee is exempt who spends part of his time each week in exempt activities and part of his time each week in non exempt activities. The Administrator's contention that such an employee is not exempt unless he spends fifty per cent of his time in the exempt activities is not sustained by the ruling heretofore made by the Circuit Court of Appeals for this Circuit. It was stated in Walling v. Morris, 6 Cir., 155 F.2d 832, following Fletcher v. Grinnell Bros., 6 Cir., 150 F.2d 337, 340, and West Kentucky Coal Co. v. Walling, 6 Cir., 153 F.2d 582, that such an employee is in the exempt classification if he devotes a substantial part of his time during the work week to work of the exempt classification. In Richardson v. James Gibbons Co., 4 Cir., 132 F.2d 627 (affirmed at 319 U.S. 44, 63 S.Ct. 917, 87 L.Ed. 1244, without discussion of that issue), the Circuit Court held that an employee who devoted twenty-five per cent of his time during the work week to exempt activities was exempt from the provisions of the Wage and Hour Law. In Walling v. Comet Carriers, supra, the Circuit Court of Appeals stated, without it being necessary to so rule, that one day's work in any one week could reasonably be considered substantial. In my opinion, each of the named employees of the defendant hereinabove referred to with the exception of William Rupple, George Hoke and Lewis Strain, devoted a substantial part of his time during the work week to exempt activities and accordingly is within the exempt provision. Although George Hoke was at the time of the trial working in an exempt classification, he had only recently changed to that type of work, and at the time when the action was filed was employed in a non exempt classification and had been so employed for approximately a year and a half prior thereto. Since the person claiming the exemption has the burden of showing that such employee is exempt (Fletcher v. Grinnell Bros., supra, C.C.A. 6th), the exemption claimed by the defendant for the employees W. Johnson and Carl R. Jackson is not established in this hearing.

The foregoing five instances of violation of the maximum hours and overtime

compensation provisions of the Act authorize an injunction against further violations of that section of the Act. See Bowles v. May Hardwood Co., 6 Cir., 140 F.2d 914, 916. Any subsequent contempt proceedings thereunder should be controlled by the views expressed herein pertaining to the nature and extent of exempt activities until changed or modified by higher authority.

■ Section 11(c) of the Act, Section 211(c), Title 29 U.S.C.A., requires the making and keeping of such records of employees and of wages, hours and other conditions and practices of employment as the Administrator shall prescribe by regulation or order as necessary or appropriate. Such regulations were promulgated, effective September 15, 1941, Title 29, Chapter 5, Code of Federal Regulations, Part 516. Section 516.2 requires the employer to maintain and preserve "payroll or other records" containing specified information on employees to whom Section 7 (a) of the Act applies. The defendant has kept such records. All the information called for is recorded at some place or in some way, although it is not all included on the payroll or any other single record. The Regulations do not require that all the required information be shown on a single record, but specifically refers to "payroll or other records." The fact that some so-called "casual" employees are for a while carried on a daily payroll instead of the regular weekly payroll for regular employees after they have changed from casual to regular employees, does not cause any failure to supply by records the information required. I am not impressed by the Administrator's effort in seeking an injunction on that phase of the case. The defendant appears to have gone to great lengths to record and make available to the Administrator all the information required. That phase of the injunctive relief requested is denied. Compare Hecht Co. v. Bowles, 321 U.S. 321, 329, 330, 64 S.Ct. 587, 88 L.Ed. 754.

Counsel for plaintiff will tender judgment for entry.