# MORRIS v. McCOMB, WAGE AND HOUR ADMINISTRATOR.

No. 7.   Argued October 13, 1947.—Decided November 17, 1947.

*George S. Dixon* argued the cause and filed a brief for petitioner.

*Harold C. Nystrom* argued the cause for respondent. With him on the brief were *Solicitor General Perlman, Stanley M. Silverberg* and *William S. Tyson.*

*Daniel W. Knowlton* filed a brief for the Interstate Commerce Commission, as *amicus curiae.*

Mr. Justice Burton delivered the opinion of the Court.

This case requires further application of the principles stated in *Levinson* v. *Spector Motor Service,* 330 U. S. 649, and *Pyramid Motor Freight Corp.* v. *Ispass,* 330 U. S. 695. The first question is whether the Interstate Commerce Commission has the power, under § 204 of the Motor Carrier Act, 1935,[1] to establish qualifications and maximum hours of service with respect to drivers and mechanics employed full time, as such, by a common carrier by motor vehicle, when the services rendered, through such employees, by such carrier, *in interstate commerce,* are distributed generally throughout the year, constitute 3% to 4% of the carrier's total carrier services, and the performance of such services is shared indiscriminately among such employees and mingled with their performance of other like services for such carrier *not in interstate commerce.* The other question is whether, if the Commission

---

[1] "Sec. 204 (a) It shall be the duty of the Commission—

"(1) To regulate common carriers by motor vehicle as provided in this part, and to that end the Commission may establish reasonable requirements with respect to continuous and adequate service, transportation of baggage and express, uniform systems of accounts, records, and reports, preservation of records, qualifications and maximum hours of service of employees, and safety of operation and equipment. . . ." 49 Stat. 546, 49 U. S. C. § 304 (a) (1).

has that power, the overtime requirements of § 7 of the Fair Labor Standards Act of 1938 [2] apply to such employees in view of the exemption stated in § 13 (b) (1) of that Act.[3] We hold that the Commission has the power in question and that the overtime requirements of § 7 of the Fair Labor Standards Act therefore do not apply to such employees.

This action was brought March 26, 1942, in the United States District Court for the Eastern District of Michigan by the Administrator of the Wage and Hour Division, United States Department of Labor, under § 17 of the Fair Labor Standards Act,[4] to enjoin the petitioner, James

---

[2] "Sec. 7. (a) No employer shall, except as otherwise provided in this section, employ any of his employees who is engaged in commerce or in the production of goods for commerce—

(1) for a workweek longer than forty-four hours during the first year from the effective date of this section,

(2) for a workweek longer than forty-two hours during the second year from such date, or

(3) for a workweek longer than forty hours after the expiration of the second year from such date,

unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed. . . ." 52 Stat. 1063, 29 U. S. C. § 207 (a).

[3] "Sec. 13. . . .

"(b) The provisions of section 7 shall not apply with respect to (1) any employee with respect to whom the Interstate Commerce Commission has power to establish qualifications and maximum hours of service pursuant to the provisions of section 204 of the Motor Carrier Act, 1935; . . . ." 52 Stat. 1068, 29 U. S. C. § 213 (b) (1).

[4] "Sec. 17. The district courts of the United States . . . shall have jurisdiction, for cause shown, and subject to the provisions of section 20 (relating to notice to opposite party) of the Act entitled 'An Act to supplement existing laws against unlawful restraints and monopolies, and for other purposes', approved October 15, 1914, as amended (U. S. C., 1934 edition, title 28, sec. 381), to restrain violations of section 15." 52 Stat. 1069, 29 U. S. C. § 217.

F. Morris, from violating § 15 (a) (1) and (2) of that Act [5] through failure to pay his employees compensation for overtime in accordance with § 7 of that Act.[6]   After a trial based on the pleadings and stipulated facts, the complaint was dismissed September 26, 1945.   In its unreported conclusions of law the court stated that neither the petitioner nor his employees were engaged "in the production of goods for commerce" within the meaning of the Fair Labor Standards Act and that, to the extent that they might be considered to be engaged "in commerce" within the meaning of that Act, the requirements of its § 7, as to compensation for overtime, did not apply to them.   The Circuit Court of Appeals for the Sixth Circuit reversed this judgment May 29, 1946, and remanded the case for further proceedings.   *Walling* v. *Morris,* 155 F. 2d 832.   Because of its importance in interpreting the Motor Carrier Act and the Fair Labor Standards Act and because the question first stated above had not been passed upon in our decisions in the *Levinson*

---

[5] "SEC. 15. (a) . . . , it shall be unlawful for any person—

(1) to transport, offer for transportation, ship, deliver, or sell in commerce, or to ship, deliver, or sell with knowledge that shipment or delivery or sale thereof in commerce is intended, any goods in the production of which any employee was employed in violation of section 6 or section 7, or in violation of any regulation or order of the Administrator issued under section 14; except that no provision of this Act shall impose any liability upon any common carrier for the transportation in commerce in the regular course of its business of any goods not produced by such common carrier, and no provision of this Act shall excuse any common carrier from its obligation to accept any goods for transportation;

(2) to violate any of the provisions of section 6 or section 7, or any of the provisions of any regulation or order of the Administrator issued under section 14; . . . ."   52 Stat. 1068, 29 U. S. C. § 215.

[6] See note 2, *supra.*

and *Pyramid* cases, *supra,* we granted certiorari, 330 U. S. 817, limited to the following question:

"2. Where such employees [*i. e.,* those of a common carrier for hire who conducts a general cartage business] during a minority of their time are engaged in the transportation of interstate traffic are they exempt under the provisions of Section 13 (b) (1) of the Act from the maximum hours provision of Section 7 of the Act as employees with respect to whom the Interstate Commerce Commission has power to establish qualifications and maximum hours of service pursuant to the provisions of Section 204 of the Motor Carrier Act, 1935 (49 U. S. C. sec. 301, *et seq.*)?"

In response to our invitation, the Interstate Commerce Commission filed a brief *amicus curiae.*

The material facts are treated by the parties as being those shown by the record to have been in effect when the complaint was filed in 1942. They may be summarized as follows:

The petitioner then was, and for the past 12 years had been, the sole owner and proprietor of the J. F. Morris Cartage Company which operated a general cartage business as a common carrier by motor vehicle in and about the metropolitan area of Detroit, Michigan, and all within three contiguous counties of that State. His operations were centralized at Ecorse, Michigan, at his garage and yard, used for a dispatching office, general maintenance and repair garage and storage space for equipment.

His principal business was the transportation of steel. In the regular course of his business, in 1941, he generally employed about 60 persons, 40 as truck drivers, 14 as mechanics, painters, washers and repairmen in the garage, three as dispatchers and three as general office workers. His equipment consisted of about 50 trucks or tractors and 60 trailers.

He was prepared to and did render general cartage service to the general shipping public. In 1941, he rendered such service to 47 consigning firms, but about 97% of his revenue came from the Great Lakes Steel Corporation and the Michigan Steel Corporation, both in Ecorse. His general cartage services, in 1941, were made up of three intermingled types of service, generally classifiable as follows on the basis of the revenue derived from them: (1) 35%: Transportation of steel largely within steel plants. This was transported for further processing in those plants and an unsegregated portion of it was shipped ultimately in interstate commerce. (2) 61%: Transportation between steel mills and industrial establishments. These shipments consisted principally of bumper stock, fender stock and other types of steel used in connection with the manufacture of automobiles, a substantial portion of which entered interstate commerce. (3) 4%: Transportation of miscellaneous freight directly in interstate commerce, either as part of continuous interstate movements or of interstate movements begun or terminated in metropolitan Detroit.[7]

---

[7] This activity is described as follows:

"C. Approximately three (3) per cent of the defendant's operations consists of the transportation of freight between the plants of the Great Lakes Steel Corporation and the plants of the Michigan Steel Corporation on the one hand, and, on the other hand, interchange points, such as boat docks, railroad depots, freight terminals and truck terminals lying in the Detroit Metropolitan Area, wholly within the boundaries of the State of Michigan, involving the picking up of freight from or the delivery of freight to water carriers, railroad carriers and line haul motor carriers, which freight either has moved across the Michigan State lines or is about to move across the Michigan State lines in continuous transportation through connection between the defendant and such other interstate carriers. The defendant's compensation for his portion of the through transportation service is in some instances paid to him by the interstate carrier, the compensation

Ever since § 7 of the Fair Labor Standards Act took effect, October 24, 1938, petitioner's employees, with the exception of his office workers, consistently worked enough hours to entitle them to additional compensation at the rate of one and one-half times their regular wages if such Section were applicable to them. They were, however, paid on the assumption that the Section did not apply to them and, therefore, for the most part, received only their regular rate of pay for such overtime. Accordingly, if it is found that § 7 is applicable to them, there is ground for an injunction against its further violation. No issue is presented here as to the office workers because there is no proof of overtime services having been rendered by them or being now in prospect. No issue is presented here as to the dispatchers. The Circuit Court of Appeals held that § 7 applies to them as employees engaged in the production of goods for interstate commerce and that they are not exempt as administrative employees. Those issues, however, are not within the limited grant of certiorari. As to the garagemen and laborers, including mechanics, painters, washers and repairmen, together with their superintendent of maintenance, there is no issue presented here, except to the extent that such classifications include mechanics doing the class of work defined as that of "mechanics" in *Ex*

representing a division of the through rates on the transportation movement, and other instances being compensated by the shipper.

. . . . .

"E. Approximately one (1) per cent of the defendant's operations consists of the transportation of miscellaneous freight in general cartage service for hire and for shippers other than Great Lakes Steel Corporation or Michigan Steel Corporation. Cartage in this category is of the same physical character as that described in subparagraphs A, C, and D above, except that it is done on behalf of and for the account of shippers other than Great Lakes Steel Corporation and Michigan Steel Corporation."

*Parte No. MC–2,* 28 M. C. C. 125, 132, 133,[8] including the making of mechanical repairs directly affecting the safe operation of motor vehicles. All of the garagemen and laborers, except their superintendent of maintenance,

---

[8] "(1) *Mechanics and other garage workers.*—The evidence is clear that carriers that do not operate approximately 10 motor vehicles or more cannot economically employ mechanics to do repair work, and they do not do so. . . .

"The larger carriers, however, do employ mechanics whose primary duties are to keep the motor vehicles in a good and safe working condition. They are required, for example, to keep the lights and brakes in such condition. They perform many other duties, of course, but these are sufficient to show clearly that the duties of these employees do affect safety of operation directly, as it is obvious that a large motor vehicle without the required lights or adequate brakes is a great potential hazard to highway safety. All witnesses testifying at the hearing agreed that the work of mechanics has such a direct and intimate relation to safety of operation, and no conflicting evidence was submitted.

.        .        .        .        .

"Our conclusion is that mechanics devote a large portion of their time to activities which directly affect the safety of operation of motor vehicles operated in interstate or foreign commerce, and hence that we have power to establish qualifications and maximum hours of service for such employees under said section 204 (a).

"There are other garage employees who do not perform work which affects safety of operation directly. Some carriers employ men who do nothing but paint vehicles. Others employ carpenters, and some few employ tarpaulin tailors. We find that the work done by none of these employees affects safety of operation.

"It is possible, although the record does not clearly establish the fact, that some of the larger carriers employ men whose sole duty is to see that the motor vehicles are properly supplied with oil, gas, and grease, or to wash the vehicles. In the majority of cases, undoubtedly, the mechanics perform this work. However, if there be employees who do nothing but oil, gas, grease, or wash the motor vehicles, we find that they do not perform duties which directly affect the safety of operation and are not subject to our jurisdiction. To make our finding in this regard entirely clear, it is that mechanics are the only garage workers we find subject to our jurisdiction." *Ex Parte No. MC–2,* 28 M. C. C. 125, 132, 133.

were paid for their overtime work at "straight" or regular hourly rates. He was paid a weekly wage, and received no overtime pay, although he devoted approximately 25% of his time to the performance of routine physical tasks of the same general character as those of the employees working under his direction. The Circuit Court of Appeals held that the superintendent of maintenance was not exempt as an executive or administrative employee and should be classified in the same manner as the others in this group. There is nothing in the record showing the extent to which the respective garagemen and laborers devoted themselves to the several classes of work above mentioned and, if this were an action to recover overtime compensation for individual employees, it would be necessary to determine that fact. However, as this is an action only for an injunction relating to future practices, the situation can be met by limiting the injunction to the appropriate classifications of workers. On this basis, the injunction against violation of § 7 of the Fair Labor Standards Act may be issued as to those garagemen and laborers who are not "mechanics" as defined by the Interstate Commerce Commission, and the issue before us is limited to the proper application of such an injunction to such "mechanics."

The drivers are full-time drivers of motor vehicles well within the definition of that class of work by the Commission if the work is done in interstate commerce.[9] From October 24, 1938, to August 1, 1940, the drivers received their "straight" or regular hourly rate of pay for all overtime work. Since August 1, 1940, their overtime work has been paid for in accordance with a collective bargaining agreement in force as to union drivers, throughout metropolitan Detroit, employed either in intrastate or interstate general cartage. From August 1,

---

[9] Safety Regulations (Carriers by Motor Vehicle), 49 CFR Cum. Supp., Parts 190–193.

1940, to August 1, 1941, these agreements required payment of overtime in excess of 52 hours a week at one and one-half times the regular rate. After August 1, 1941, as a concession to wartime conditions, this additional rate was applied only to overtime in excess of 54 hours a week. The statutory workweek which would be applicable under § 7 of the Fair Labor Standards Act at all times has been substantially shorter than those just mentioned.[10]

As to these drivers and these "mechanics" whose work affects safety of transportation, the first question here, as in the *Levinson* case, is whether the Commission has the power, under § 204 of the Motor Carrier Act, to establish qualifications and maximum hours of service with respect to them. The special situation presented is that, on the average, only about 4% of their time and effort has been, or is likely to be, devoted to services in interstate commerce. The issue would appear in its simplest form if each driver were required, each day, to devote 24 minutes (*i. e.*, 4% of his allowable daily aggregate of ten hours of driving time) to driving in interstate commerce. The question then would be whether the Commission has the power to establish his qualifications and maximum hours of service in view of the relation of this driving to safety of operation in interstate commerce. Under the tests of the Commission's power, as approved in both the majority and minority opinions in the *Levinson* case, and, under the analysis of that power developed by the Interstate Commerce Commission and cited in that case, it is "the character of the activities rather than the proportion of either the employee's time or of his activities that determines the actual need for the Commission's power to establish reasonable requirements with respect to qualifications, maximum hours of service, safety of

---

[10] See note 2, *supra.*

operation and equipment."[11]  It is beyond question that, under such circumstances, § 204 (a) (1) of the Motor Carrier Act[12] has authorized the Commission to establish reasonable requirements with respect to qualifications and maximum hours of service of such drivers.  The Fair Labor Standards Act, which was passed three years later, has recognized and does not restrict the Commission's power over the safety of operation under the Motor Carrier Act.  What is thus true for the driver is true also for the mechanic who repairs his truck.

In the record before us, instead of 4% of the driving time of each driver being devoted each day to interstate commerce without relation to what the driver does at other times, the parties present the actual experience of the petitioner and his drivers throughout 1941.  The printed record, together with an unprinted exhibit filed with the Clerk, classifies all of the 19,786 trips taken in 1941 by the 43 drivers who respectively drove motor vehicles for the petitioner during not less than eight weeks in that year.  Only the "Pickup Trips" and "Boat Dock Trips" are counted as being in "interstate commerce."  These involved movements of goods to or from railroad freight houses, line haul motor carrier depots or the boat docks of the several steamship companies in Detroit.  It was stipulated that the petitioner was "engaged as a common carrier for hire in the local transportation of property by motor vehicle," was "engaged in a general cartage business and . . . [was] prepared to render such service to

---

[11] *Levinson* v. *Spector Motor Service*, 330 U. S. 649, 674–675.

"For, factually speaking, not the amount of time an employee spends in work affecting safety, but what he may do in the time thus spent whether it be large or small determines the effect on safety.  Ten minutes of driving by an unqualified driver may do more harm on the highway than a month or a year of constant driving by a qualified one."  *Id.,* dissenting opinion, at p. 687.

[12] See note 1, *supra*.

the general shipping public . . . ." Each driver appears to have been a full-time driver during each week that he worked. The tables show 464 "Pickup Trips" and 260 "Boat Dock Trips," or a total of 724 made in interstate commerce, when and as required by petitioner's consignors. These constituted 3.65% of the petitioner's total trips. They were not distributed equally to each driver nor on the basis of 4% of his time each day. However, apparently in the normal operation of the business, these strictly interstate commerce trips were distributed generally throughout the year and their performance was shared indiscriminately by the drivers and was mingled with the performance of other like driving services rendered by them otherwise than in interstate commerce. These trips were thus a natural, integral and apparently inseparable part of the common carrier service of the petitioner and of his drivers.

One or more such trips were taken by one or more drivers each week. The average number of drivers making one or more such trips in each week was nine drivers out of 37, or 24.4%. There were six weeks in which more than half of the drivers thus engaged directly in interstate commerce. The highest percentage of drivers making such trips in one week was 78.1%, when 25 drivers, out of the 32 then on duty, did so. As to the distribution of such trips, throughout the year, among the total of 43 drivers, every driver, except two, made at least one such trip with interstate freight. Each of the two who failed to make any such trip was employed for only about one-half the year and that was during the months when the trips in interstate commerce were the less frequent. On the other hand, one driver made 97 such trips in interstate commerce. Another made 52 and the average per driver was over 16. The greatest number of such trips made by a single driver in a single week was seven out of nine. In several other weeks he made six such trips out of a total of

seven in the week. The net result is a practical situation such as may confront any common carrier engaged in a general cartage business, and who is prepared and offering to serve the normal transportation demands of the shipping public in an industrial metropolitan center. From the point of view of safety in interstate commerce, the hazards are not distinguishable from those which would be presented if each driver drove 4% of his driving time each day in interstate commerce. In both cases there is the same essential need for the establishment of reasonable requirements with respect to qualifications and maximum hours of service of employees. If the common carrier is required, by virtue of that status, to take this interstate business he must perform the required service in accordance with the requirements established by the Commission. The Commission has made no exception in these qualifications and maximum hours of service that would exempt the drivers of the petitioner from them as a class. The applicability of the Commission's present requirements as to specific drivers during specific weeks is not the issue before us. We hold that the Commission has the *power* to establish qualifications and maximum hours of service, pursuant to the provisions of § 204 of the Motor Carrier Act, for the entire classification of petitioner's drivers and "mechanics" and it is the existence of that power (rather than the precise terms of the requirements actually established by the Commission in the exercise of that power) that Congress has made the test as to whether or not § 7 of the Fair Labor Standards Act is applicable to these employees.[13]

---

[13] "We recognize, as a practical matter, that private carriers transport property both in interstate and intrastate commerce. The same motor vehicle, operated by the same driver, on 1 or 2 days in a week may be engaged in transporting property in interstate commerce and the rest of the week may be engaged in intrastate commerce. In our opinion if a driver operates a motor vehicle in the transportation of interstate or foreign commerce on any day of a given week,

Congress has gone out of its way to make this purpose clear in cases comparable to the one before us. It has done this by making the power of the Commission, under § 204 of the Motor Carrier Act, expressly applicable to motor vehicle pickup and delivery service within terminal areas [14] to transportation in interstate commerce

---

such driver is subject to the weekly maximum herein prescribed. Likewise if a driver employed by a private carrier of property is engaged in interstate commerce during any one period of 24 consecutive hours, he is subject to the daily maximum herein prescribed. If such a driver does not drive or operate a truck in the transportation of property in interstate or foreign commerce for an entire week, he is not subject to the regulations *herein prescribed* during that week. *We express no opinion as to whether or not during that week the driver is subject to the provisions of section 7 of the Fair Labor Standards Act.*" (Italics supplied.) *Ex Parte No. MC–3*, 23 M. C. C. 1, 39.

The above statement demonstrates the Commission's opinion as to its power to establish qualifications and maximum hours of service in the field of mixed interstate and intrastate transportation. The rules that it has prescribed have not extended to its full power to make rules in this field. The fact that this statement was made in 1940, three years before the decision of this Court in *Southland Co.* v. *Bayley*, 319 U. S. 44, explains the express reservation made as to the Commission's opinion relating to the effect of the scope of its unexercised powers under § 204 of the Motor Carrier Act in relation to § 7 of the Fair Labor Standards Act. For the Commission's regulations of Hours of Service (Carriers by Motor Vehicle) see 49 CFR Cum. Supp., Part 191.

[14] "Sec. 202. . . .

"(c) Notwithstanding any provision of this section or of section 203, the provisions of this part, except the provisions of section 204 relative to qualifications and maximum hours of service of employees and safety of operation and equipment, shall not apply—

"(1) to transportation by motor vehicle by a carrier by railroad subject to part I, or by a water carrier subject to part III, or by a freight forwarder subject to part IV, incidental to transportation or service subject to such parts, in the performance within terminal areas of transfer, collection, or delivery services; . . . ." § 202 (c) (1), 49 Stat. 543, as amended by 56 Stat. 300, 49 U. S. C. (Supp. V, 1946), § 302 (c) (1).

wholly within a metropolitan area,[15] and to casual, occasional, or reciprocal transportation of property in interstate commerce by any person not engaged in transportation by motor vehicle as a regular occupation or business.[16] It has made the Commission's power over safety requirements expressly applicable to these operations, even though, at the same time, Congress has exempted them from general regulatory control.

Congress furthermore has provided a special procedure by which, in an appropriate case, an *intrastate motor carrier* or any other party in interest, may secure the general exemption of such a carrier from compliance with the Motor Carrier Act even though such carrier does perform some interstate transportation. Congress, however, expressly has authorized the Commission, and not the courts, to decide when the case is an appropriate one

---

[15] "SEC. 203. . . .

"(b) Nothing in this part, except the provisions of section 204 relative to qualifications and maximum hours of service of employees and safety of operation or standards of equipment shall be construed to include . . . (8) The transportation of passengers or property in interstate or foreign commerce wholly within a municipality or between contiguous municipalities or within a zone adjacent to and commercially a part of any such municipality or municipalities, except when such transportation is under a common control, management, or arrangement for a continuous carriage or shipment to or from a point without such municipality, municipalities, or zone, and provided that the motor carrier engaged in such transportation of passengers over regular or irregular route or routes in interstate commerce is also lawfully engaged in the intrastate transportation of passengers over the entire length of such interstate route or routes in accordance with the laws of each State having jurisdiction; or (9) the casual, occasional, or reciprocal transportation of passengers or property in interstate or foreign commerce for compensation by any person not engaged in transportation by motor vehicle as a regular occupation or business." 49 Stat. 545–546, 49 U. S. C. § 303 (b) (8) and (9).

[16] See note 15, *supra*.

for such a general exemption.[17]    It does not appear that any such certificate of exemption has been obtained or sought as to this petitioner.

Having determined that the Commission has the power to establish qualifications and maximum hours of service for these drivers and "mechanics" under § 204 of the Motor Carrier Act, the question recurs as to whether, in the face of the exemption stated in § 13 (b) (1) of the Fair Labor Standards Act, the requirements of § 7 of that Act nevertheless apply to these employees.    This issue as to the possible reconciliation of the language of these Acts so as to provide for concurrent jurisdiction was con-

---

[17] "Sec. 204 (a)  It shall be the duty of the Commission—

.            .            .            .            .

"(4a)  To determine, upon its own motion, or upon application by a motor carrier, a State board, or any other party in interest, whether the transportation in interstate or foreign commerce performed by any motor carrier or class of motor carriers lawfully engaged in operation solely within a single State is in fact of such nature, character, or quantity as not substantially to affect or impair uniform regulation by the Commission of transportation by motor carriers engaged in interstate or foreign commerce in effectuating the national transportation policy declared in this Act.    Upon so finding, the Commission shall issue a certificate of exemption to such motor carrier or class of motor carriers which, during the period such certificate shall remain effective and unrevoked, shall exempt such carrier or class of motor carriers from compliance with the provisions of this part, and shall attach to such certificate such reasonable terms and conditions as the public interest may require.    At any time after the issuance of any such certificate of exemption, the Commission may by order revoke all or any part thereof, if it shall find that the transportation in interstate or foreign commerce performed by the carrier or class of carriers designated in such certificate shall be, or shall have become, or is reasonably likely to become, of such nature, character, or quantity as in fact substantially to affect or impair uniform regulation by the Commission of interstate or foreign transportation by motor carriers in effectuating the national transportation policy declared in this Act. . . ."    49 Stat. 546, as amended by 54 Stat. 921, 49 U. S. C. § 304 (a) (4a).

sidered at length in the *Levinson* case and the conclusion was there reached that such a construction was not permissible.

This discussion has proceeded on the basis of the facts which were stipulated to exist in 1942. This treatment, however, should not be interpreted as necessarily restricting the District Court to the present record if, for good cause, that court finds it advisable to consider additional evidence or to retry the case *de novo*.

For these reasons, the judgment of the Circuit Court of Appeals is vacated and the cause is remanded to the District Court for further proceedings consistent with the opinion of the Circuit Court of Appeals, as here modified.

*It is so ordered.*

Mr. Justice Murphy, with whom Mr. Justice Black and Mr. Justice Douglas concur, dissenting.

Apart from § 13 (b) (1), it is clear that petitioner's truck drivers and mechanics are subject to the wage and hour provisions of the Fair Labor Standards Act. They spend virtually all of their time in transportation activities which are an integral part of the production of goods for interstate commerce. *Walling* v. *Comet Carriers,* 151 F. 2d 107. The issue thus becomes one of determining whether these employees are plainly and unmistakably within the terms and spirit of the § 13 (b) (1) exemption, giving due regard to the rule that exemptions from the operation of humanitarian legislation are to be narrowly construed. *Phillips Co.* v. *Walling,* 324 U. S. 490, 493.

By a pedantically literal reading of § 13 (b) (1), it is possible to say that these employees are among those as to whom the Interstate Commerce Commission has "power" to establish qualifications and maximum hours of service. A sporadic and minute portion of their activities, approximating 3% to 4% of the total, affects the

safety of operation of trucks in interstate commerce. The Commission's power under § 204 (a) of the Motor Carrier Act is confined to regulation of transportation in interstate and foreign commerce; and its jurisdiction over employees' activities is limited to those which affect the safety of operation of motor vehicles engaged in such transportation. *United States* v. *American Trucking Assns.*, 310 U. S. 534. Hence the potential scope of the Commission's "power" over petitioner's employees is extremely narrow. Approximately 97% of their activities are beyond the jurisdiction of the Commission. Yet it is by the slender thread of this "power" that they fall within § 13 (b) (1) and hence are deprived of the benefits of the Fair Labor Standards Act.

Due respect for the legislative purpose militates against such a result. We are dealing here with a statute that is dedicated to the proposition that laboring men are to be treated as something more than chattels. And their statutory rights are not to be discarded by adherence to formalistic dogmas of interpretation. Section 13 (b) (1) is not just an exercise in grammar. It is part of the living fiber embodying the rights of those who labor for others. It must be read and interpreted in the light of reason and in the light of the aims which Congress sought to achieve.

When that is done, it becomes clear that when § 13 (b) (1) speaks of those over whom the Interstate Commerce Commission has "power" it means those who perform at least a substantial amount of activities within the Commission's jurisdiction. Congress was not concerned with insignificant conflicts between Fair Labor Standards Act regulations and Interstate Commerce Commission regulations. Nor was it desirous of leaving unregulated nearly all of the working time of those who are engaged in the production of goods for commerce but who spend infinitesimal amounts of time directly in interstate transportation. In other words, engaging in

an occasional and microscopic amount of activities affecting safety of operation should no more exclude employees from the Act than sporadically shipping insubstantial amounts of goods in interstate commerce should bring those engaged in such shipments within the purview of the Act. See *Mabee* v. *White Plains Pub. Co.,* 327 U. S. 178, 181. That was implicitly recognized by the Court in *Pyramid Motor Corp.* v. *Ispass,* 330 U. S. 695, 708, and I had not supposed until now that that case or *Levinson* v. *Spector Motor Co.,* 330 U. S. 649, justified any other result.

Interpreting § 13 (b) (1) in disregard of reality only acts as an open invitation to evade the Act and to destroy the statutory rights of those trucking concern employees who now perform no activities which affect the safety of operations. All that the employer need do to withdraw the benefits of the Act from these employees is to send them occasionally to a terminal to pick up or deliver a piece of interstate freight. They then fall into the "power" of the Interstate Commerce Commission and automatically lose their rights under the Fair Labor Standards Act. I accordingly dissent.

MR. JUSTICE RUTLEDGE, dissenting.

But for this Court's decisions in the *Levinson* and *Ispass* cases, my views in this case would be in substantial accord with those expressed by MR. JUSTICE MURPHY. See *Levinson* v. *Spector Motor Service,* 330 U. S. 649, dissenting opinion at 685; *Pyramid Motor Freight Corp.* v. *Ispass,* 330 U. S. 695. I thought the decisions in those cases foreshadowed the extreme result here, which goes so far as to exclude from the Fair Labor Standards Act's protection at least two employees who made no trips in what petitioner regards as the interstate phase of his business. While on the other hand one driver made 97 such trips, there were others who made only very occasional ones.

Although I regarded the *Levinson* and *Ispass* decisions as foreshadowing and perhaps concluding any situation where the employee's work would substantially affect safety in interstate operations, and thus as going to the extent of exempting from Fair Labor Standards Act coverage any employee whose work substantially affects such safety, I did not understand that all employees driving for a company engaged principally in intrastate commerce but doing a very small amount of interstate commerce would be lumped together, for purposes of the exclusion, on the basis of the proportionate amounts of work done by the company in those phases of its business. That I think is the effect of the present decision. To that extent, I also think the ruling constitutes an extension of the exemption beyond that sustained in the *Levinson* and *Ispass* cases.

On the basis of the decision last term in *United States* v. *Yellow Cab Company,* 332 U. S. 218, I also have difficulty with the view that any of the carrier's services here were rendered in interstate commerce. That decision held that the transportation in Chicago of passengers and their luggage from their homes, offices, hotels, etc. to railroad stations for the purpose of boarding trains on interstate journeys, and conversely the like use of taxicabs in the reverse direction after leaving trains on arrival in Chicago following such journeys, were "too unrelated to interstate commerce to constitute a part thereof within the meaning of the Sherman Act." 332 U. S. at 230. While I was not in agreement with the *Yellow Cab* decision, the same ruling, if applied to the facts here, would make the so-called "interstate commerce," *i. e.,* the transportation of freight from petitioner's customers' places of business to shipping terminals, intrastate rather than interstate commerce.[1]

I am unable to agree with the Court's opinion.

---

[1] I do not read the stipulation of facts in this case as showing that petitioner engaged in transportation from terminal to terminal.