**TOBIN, Secretary of Labor v. MASON & DIXON LINES, Inc.**

No. 115.

United States District Court
E. D. Tennessee, N. D.

Dec. 13, 1951.

467

William S. Tyson, Solicitor, John J. Babe, Asst. Solicitor, Washington, D. C., Paul H. Sanders, Regional Atty., Marvin M. Tincher, David V. Manker, and Thos. F. Guthrie, Attys., U. S. Department of Labor, all of Nashville, Tenn., for plaintiff.

Penn, Hunter, Smith & Davis and Clifford E. Sanders, all of Kingsport, Tenn., for defendant.

ROBERT L. TAYLOR, District Judge.

This is a civil contempt proceeding which grew out of alleged violations of a consent injunction decree entered November 2, 1942, particularly paragraph 2 of said injunction, which is in the following language: "(2) Employing, contrary to Section 7 of the Act [29 U.S.C.A. § 207], any of its employees engaged in commerce, as defined by the Act, for a workweek longer than forty (40) hours, unless the employee receives compensation for his employment in excess of forty (40) hours at a rate not less than one and one-half times the regular rate at which he is employed, provided the provisions of this paragraph shall not apply to any employee with respect to whom the Interstate Commerce Commission has power to establish qualifications and maximum hours of service pursuant to the provisions of Section 204 of the Motor Carrier Act of 1935 [49 U.S.C.A. § 304]."

Effect of the quoted paragraph of the decree was to enjoin the defendant from violating the overtime provisions of the Fair Labor Standards Act of 1938, 29 U.S.C.A. § 201 et seq.

The contempt petition was filed on April 28, 1950, by the Administrator of the Wage and Hour Division, United States Department of Labor, alleging violations of the 1942 injunction decree with respect to eight of defendant's employees. Subsequent to the filing of the petition, the Secretary of Labor was substituted for the Administrator as party plaintiff.

It is averred in the petition that the defendant employed the eight named persons from about April 21, 1946, until around May 18, 1950, in interstate commerce for workweeks in excess of 40 hours without paying them not less than one and one-half times their regular hourly rates for time in excess of 40 hours per week.

As a penalty for the alleged violations the petition prays that defendant be adjudged in contempt of court, that it be required to obey the injunction of 1942 and to pay to said employees the overtime wages it should have paid, and, also, that it be required to reimburse petitioner for the expenses of this litigation and the investigatory work connected with it.

After certain preliminary motions had been made and disposed of, the defendant filed its answer, in which it denied that it had violated the injunction decree of 1942. The answer also sets up as a partial affirmative defense that this action is barred as to any violations that occurred more than two years prior to filing of the contempt petition, by virtue of the limitation provisions of the Portal-to-Portal Act, 29 U.S.C.A. §§ 255 and 256.

It has been stipulated by the parties that the defendant is an interstate motor carrier, regularly engaged in hauling goods in interstate commerce; that the eight employees named in the petition were employed by defendant during the period covered by the petition; that throughout their employment by defendant and during such period the named employees worked on vehicles or equipment used by defendant in its business; that they had in many workweeks worked in excess of 40 hours without receiving overtime pay at the rate of one and one-half times the regular hourly rate at which they were employed;

that the only issue of fact involved in this suit is whether defendant has employed the eight named employees contrary to Section 7 of the Fair Labor Standards Act and in violation of Paragraph 2 of the 1942 decree, as above set out.

The parties have further stipulated that the defendant has, since May 18, 1950, paid the eight named employees overtime compensation as required by the Fair Labor Standards Act.

Restated, the problem before the court is whether the eight named employees, or any of them, are exempt from the overtime provisions of the Fair Labor Standards Act, as employees "with respect to whom the Interstate Commerce Commission has power to establish qualifications and maximum hours of service pursuant to the provisions of section 204 of the Motor Carrier Act of 1935," as provided in Section 13(b)(1) of the Fair Labor Standards Act and Paragraph 2 of the judgment previously entered herein in 1942.

The broad principle announced by the Supreme Court is that the Commission has such power over all employees of interstate motor carriers whose activities affect safety of operation, and that the Commission does not have such power over employees whose activities do not affect safety of operation. United States v. American Trucking Associations, 310 U.S. 534, 60 S.Ct. 1059, 84 L.Ed. 1345.

Drivers and mechanics engaged in the maintenance of motor vehicles used in interstate commerce are included in the class of employees whose activities directly affect the safety of operation. Morris v. McComb, 332 U.S. 422, 68 S.Ct. 131, 92 L.Ed. 44. Loaders, helpers and loader foremen are likewise included in the class of employees whose activities directly affect safety of operation. Levinson v. Spector Motor Service, 330 U.S. 649, 67 S.Ct. 931, 91 L.Ed. 1158. Persons excluded from the class of employees whose activities directly affect safety of operation are painters, washers, garage repairmen generally, despatchers, general office workers, salesmen and executives. Morris v. McComb, 332 U.S. 422, 68 S.Ct. 131, 92 L.Ed. 44; Levin-

son v. Spector Motor Co., 330 U.S. 649, 67 S.Ct. 931, 91 L.Ed. 1158.

■■ An employee cannot be within the coverage of both acts. This is because the Fair Labor Standards Act excludes from its coverage those employees who are within the power of the Interstate Commerce Commission, as provided in Section 204 of the Motor Vehicle Act. Also, if only a part of an interstate motor carrier employee's services affect safety of operation and the rest of his services do not, he is nevertheless within the power of the Commission. Being within the power, even though the Commission has not exercised the power, the employee is excluded from the coverage of the Fair Labor Standards Act. There is no split of coverage. If the Commission has jurisdiction, the employee is exempt from coverage of the Fair Labor Standards Act. Morris v. Mc-Comb, 332 U.S. 422, 68 S.Ct. 131, 92 L.Ed. 44.

■ While services of an employee who devotes only a fraction of his time to duties affecting safety of operation and equipment exempts him from coverage of the Fair Labor Standards Act, the statement "within the power" is subject to the reasonable limitation that in order to come within the power of the Commission a substantial portion of an employee's duties must directly affect safety of operation and equipment. For example, a loader may perform such trivial duties that they may not affect safety of operation in any appreciable degree. Where that is so, the employee would be within the coverage of the Fair Labor Standards Act. Pyramid Motor Co. v. Ispass, 330 U.S. 695, 67 S.Ct. 954, 91 L.Ed. 1184.

It now becomes necessary to examine the proof pertaining to each of the eight named employees to determine whether a substantial part of the duties performed by each employee directly affects safety of operation.

The duties of Frank L. Vaught included repair of heaters and radiators in the shop. Temporary or patchwork repairs were made on radiators while in place on trucks about one-half dozen times in four or five years, about 30 minutes being required for each patch job. He did not take the radiators off the truck or put them back on. The radiators repaired by him usually went into the stockroom. Some of the radiators went back on the trucks from which they had been removed, but he did not install them. Heaters repaired by him were put back on the trucks from which they came, but he did not remove or install them. He repaired air lines and gas lines, usually by soldering. He did not make any repairs on these lines while they were in place on vehicles. He did battery work. This consisted of taking care of batteries, putting water in them and checking them to see if the battery solutions were of proper density. He decided whether old radiators taken off the trucks should be repaired, or discarded. It is explained that flex lines carry air, gas or oil. They carry air to the brakes and oil to the motor. They were tested by Vaught who used air pressure under water. The leaks disclosed were soldered by him. He soldered small leaks in gas tanks, but the big ones were welded by other employees. When this employee soldered a piece of equipment, it was he who determined whether it was properly soldered.

The air lines were too inaccessible to repair in place. The repair of them required skill. It is explained that the air lines, if not properly repaired, might cause a wreck because, as stated above, they carry air to the brakes. This employee stated: "I would not turn one loose unless I thought them absolutely safe because I know how important they are." It is explained, also, that a radiator, if leaking or clogged, will cause water loss and necessitate stopping every few miles for water. This witness described himself as a "radiator mechanic." He was classified by his employer as a class "B" mechanic.

■ The conclusion to be drawn from the foregoing summary of the testimony relating to the employee Vaught is, that his work in the main consisted of repairing heaters and radiators, principally the latter, in his workshop; that those heaters and radiators which were fit to be repaired were stored in the stockroom and eventually

found their way, through intervening hands, back onto trucks; that he also did some work on the air lines, gas lines and water lines. The repairs to these lines consisted of soldering, and practically all of this work was done in the shop. The repaired lines were placed in the stockroom. When they were put in use again they were placed on the trucks by other employees. It is apparent, accordingly, that the duties of this employee were not directly related to the safety of operations to any substantial extent. He is therefore not exempt from the coverage of the Fair Labor Standards Act. See, in the case of Keeling v. Huber & Huber Motor Express, Inc., D.C., 57 F.Supp. 617, 619, an opinion written by Circuit Judge Miller, then District Judge, where he said: "The fact that an employee is a mechanic or a carpenter by trade is not decisive. The true test is what the particular employee actually does rather than what he may be qualified to do. In the present case five of the plaintiffs are mechanics but their services are not performed on the trucks themselves. They work on parts which have been removed from the trucks and which are not replaced in the same trucks from which they were removed. While the result of their work eventually finds its way into the complete mechanism of one of the trucks, yet there is a definite and distinct break in any connection between their work and the safety of operation of the truck which ultimately uses one of the repaired parts. The correct installation of the repaired part and its inspection to determine whether or not it is suitable for use and properly installed is the duty of a different employee and such intervening duties necessarily break any continuity between the repairman in question and the safety of operation. I do not believe that the general concept of 'safety of operation' as announced in United States v. American Trucking Associations [310 U.S. 534, 60 S. Ct. 1059, 84 L.Ed. 1345], supra, includes such indirect and remote activities of the character performed by the plaintiffs in this case, even though ultimately such activities play an indirect part in the safety of operation of the trucks in question."

The work of employee David Lilley was substantially similar to that of Vaught, in that Lilley's main work was done on batteries in the shop. During an insubstantial part of his time he checked batteries on the trucks and occasionally removed corrosion and tightened a loose cable. He therefore falls within the same category as that of Vaught.

The activities of three employees, namely, Carmack, Lloyd and Talbert, were essentially the same.

Their duties for the most part included repairing of doors on tractors and trailers, repairing of fenders which involved disconnecting and connecting light wires and air lines, installing windshields and safety glass in doors, replacing headlights in damaged fenders, removing, repairing and replacing radiators, repairing trailer floors, repairing hood latches and replacing defective springs, adjusting and fastening cab seats, attaching rearview mirrors, repairing and installing bumpers, repairing tail gates, installing flares and fire extinguishers, in tractor cabs, repairing hoods of tractors, and repairing truck beds, and radiator grills. They also built or assembled bodies of vehicles, the time involved being one or two days a week. The fenders were sometimes removed for repairing. Sometimes they were repaired without removal from the vehicle. The jobs enumerated above involved removing doors, taking them apart and repairing damages, reassembling and putting the doors back on the cabs, or on the trailers. The work also included cutting and fastening sheet metal to doors and bodies, the grinding of the metal with sanders and the polishing of same with lead polish. The removal and replacement of fenders included disconnecting and reconnecting light wires and air lines, the latter lines being a part of the pneumatic system which, among other things, operated the brakes. The repair of trailers and semitrailers included the removal of damaged parts and their replacement by new parts. The repair of trailer floors involved the removal of broken or defective parts and installing such parts as cross sills and floor boards. Relaying a floor, or a portion of a floor, involved boring holes in the floor

for the insertion of bolts and the fastening of bolts in place. Repair of trailers also included the repair of leaks in the roof and of broken places in the side-walls, the repairs being done by patches which were welded into place. Removing the cabs for repair and reinstalling the cabs involved the disconnecting and reconnecting of air lines, and sometimes a part of the electric wiring, depending on whether the instrument panel was removed with the cab, or left in place. Cab repairs included also bolting the cab and forcing it into correct alignment. Aligning the cab involved use of jacks, drift-pins and draw-bars. Installing of windshields on some models involved removal of windshield wipers and replacement of the same, the windshield wipers which were operated by air being part of the pneumatic system of the vehicle to which attached. The work of these employees included also the tramming of trailer axles, the installation and adjustment of trailer doors, latches and holdbacks, the removal and installation of clearance lights on trailer bodies, and occasionally the installation of radiators to replace damaged ones.

██ It appears from the foregoing that the activities of these employees operated directly upon equipment and were of such character as directly to affect safety of operation to a very substantial extent. They are accordingly exempt from coverage of the Fair Labor Standards Act. Morris v. McComb, 332 U.S. 422, 68 S.Ct. 131, 92 L.Ed. 44; McDuffie v. Hayes Freight Lines, Inc., D.C., 71 F.Supp. 755; Walling v. Silver Fleet Motor Exp., D.C., 67 F. Supp. 846.

The duties of Frank Lazenby, H. D. McGrady and B. O. Brown, also, were essentially the same. These three employees are, accordingly, treated together. Their work in the main was that of carpenters. During the period under consideration they erected a warehouse in which they afterwards used a small space for carpenter work. They repaired office desks and built some office equipment, including tables and chairs. In the shop they built trailer doors and tail gates. They did repairs on tractor cabs which had been removed by other employees and brought into their working space. In their shop they built wooden frames for cabs, made new pieces to replace those which had been broken, or had decayed, built or rebuilt door frames, installed glass in cab doors and cut wood blocks for fifth wheels, which blocks, however, were installed by other employees. Occasionally, they worked directly on vehicles, such work including the installation of hinges on hoods, replacing portions of trailer floors, installing trailer door holdbacks, placing flares, flags and fire extinguishers in trailer cabs. Occasionally they installed rear-view mirrors and patched leaks in the tops of trailers. Once in a great while they installed a bumper, radiator grill and weather stripping around cab doors. During an indeterminate part of the period under consideration, these employees checked windshield wipers, window lifts in cab doors, windshields, license plates, and brackets that held license plates. They also did a small amount of welding by way of patching leaks in trailer tops and broken places in the sides of the trailers. Occasionally, they worked on cabs in place on the tractors. This work consisted mainly of tightening bolts. The tools used by these employees consisted mainly of braces and bits, handsaws, wood chisels, hammers and planes, and a small number of wrenches that were used where bolts were required in connection with their work. Their work in the main was done in the warehouse or shop on parts of vehicles which had been removed and brought to them, or in building articles new. Included in their work, especially in that of Brown, was the repairing of cab seats, which involved taking the cushions apart, removing broken springs, putting in new springs, restoring the cotton pads, putting the cushions together again and fastening them back on the cab seat. While they did their building and repair work in their carpenter shop, they occasionally assisted in hanging cab and trailer doors, adjusting door latches, inspecting trailer doors, and hold-backs and in aligning tractor cabs.

██ The work which they did directly on equipment had no direct relation to safety of operation except to a minor ex-

tent. It cannot be said as to these three employees that a substantial portion of their duties related directly to safety of operation. Accordingly, they are not exempt from coverage of the Fair Labor Standards Act. See as pointing to this conclusion, Keeling v. Huber & Huber Motor Express, Inc., D.C., 57 F.Supp. 617, 619; Walling v. Huber & Huber Motor Express, Inc., D.C., 67 F.Supp. 855; McDuffie v. Hayes Freight Lines, Inc., D.C., 71 F.Supp. 755.

■ We come now to consideration of the statute of limitations, which is asserted by the defendant in its answer as an affirmative defense. The Government insists that the limitation provisions in Sections 6 and 7 of the Portal-to-Portal Act of 1947, 29 U.S.C.A. §§ 255, 256, are not applicable for the reason that this suit was commenced prior to May 14, 1947, the day that the Portal-to-Portal Act became effective. It is said by the Government that Section 6 of the Act applies only to "any action commenced on or after the date of the enactment of this Act."

The Government further insists that if the contempt proceedings should be regarded as the commencement of a new action, the Portal-to-Portal Act limitation period would still be inapplicable, it being urged such proceeding is predicated upon the court's authority to enforce its decrees under its inherent equity jurisdiction, whereas, Section 6 is expressly limited to an action "to enforce any cause of action * * * under the Fair Labor Standards Act * * *."

A careful search had been made for court opinions construing the limitations provisions of the Portal-to-Portal Act. The courts have so far held that the limitation proceedings of the Act are binding on the United States or its agencies. By its terms a limitation provision applies to actions under the Walsh-Healey Act, 41 U.S.C.A. § 31 et seq., where only the Government has a cause of action. Unless the Government commences its action within two years from accrual of the cause of action, the action is barred. Lance, Inc., v. United States, 4 Cir., 190 F.2d 204; United States v. Lovknit Mfg. Co., 5 Cir., 189 F.2d 454;

United States v. Unexcelled Chemical Corp. D.C., 99 F.Supp. 155. Only one decision has been found wherein the statute of limitations was pleaded as a defense in a contempt proceeding brought to enforce penalties for violation of an injunction, where the injunction restrained violation of the Fair Labor Standards Act of 1938. That is the carefully worked out opinion of Judge Wyche in Tobin v. Alma Mills, D.C.W.D. S.C., 92 F.Supp. 728. In that opinion Judge Wyche said:

"We come now to the determination of the question of whether or not the Portal-to-Portal Act places any limitation on proceedings in contempt brought by the Administrator. The plaintiff strongly contends that it does not, but that its provisions apply solely to actions brought by employees for unpaid minimum wages, unpaid overtime compensation, or liquidated damages under the Fair Labor Standards Act.

"This contention is answered by the Report of the Judiciary Committee of the House wherein it is stated that 'The sections (Sections 3 and 4 of the Act) apply to all actions and proceedings of every kind based on the activities in question, including all suits for wages, damages, or penalties, actions for injunctions and criminal prosecution.'

"It would seem that the plaintiff's position is that though the employee himself has no right under the provisions of the Portal-to-Portal Act to maintain an action to recover unpaid minimum or overtime wages or liquidated damages, yet the Administrator where he has an injunction to enjoin violations of the Fair Labor Standards Act can still recoup such wages for the benefit of the employee. Such an application of the Portal-to-Portal Act would operate to defeat the purpose of the Act. The Portal-to-Portal Act has taken away certain substantive rights which existed prior to its enactment, which rights were given to employees (and to the Administrator) by the Fair Labor Standards Act. If plaintiff's contention were adhered to, these substantive rights would have been taken away from the employee and yet at the same time remain there for his bene-

fit in an action brought by the Administrator.

"The Act itself shows by its very terms that such a construction was never intended to be placed thereon. In every instance the statute uses the phrase 'no employer shall be subject to any liability or punishment.' No limitation is placed on these words to affect an exclusion as to one individual or another. There just is no right in existence for anyone to enforce.

"What has been said above in reference to the taking away of substantive rights must likewise be said as to the statute of limitations set up in section 6 of the Act, 29 U.S.C.A. § 255. The plaintiff urges that the limitation in this statute does not apply to the instant case. This argument is based on the general rule that limitations do not run against the government unless the statute imposing them clearly indicates the intention that they so apply. United States v. Nashville, etc., R. Co., 118 U.S. 120, 6 S.Ct. 1006, 30 L.Ed. 81.

"The plaintiff cites the case of United States v. Silliman, 3 Cir., 167 F.2d 607, wherein it is held that the general rule as to the statute of limitations not applying to the government likewise applies whenever the United States is the real party in interest, whether the suit is brought by it or in the name of another but for its benefit. However, here, in respect of the restitution of back wages, the proceeding is for the benefit of the employees in an action brought by an official acting in behalf of the United States and the employees.

"Admittedly the statute of limitations would apply to any action brought by the employees. What greater right does the party suing have than the party for whose benefit the suit is brought? He must be limited in his recovery to that which the holder of the beneficial interest is entitled to.

"Section 6 of the Portal-to-Portal Act provides as follows:

" 'Any action commenced on or after the date of the enactment of this Act, to enforce any cause of action for unpaid minimum wages, unpaid overtime compensation, or liquidated damages, under the Fair Labor Standards Act of 1938, as amended, the Walsh-Healey Act, or the Bacon-Davis Act [40 U.S.C.A. § 276a et seq.]—

" '(a) if the cause of action accrues on or after the date of the enactment of this Act—may be commenced within two years after the cause of action accrued, and every such action shall be forever barred unless commenced within two years after the cause of action accrued;

" '(b) if the cause of action accrued prior to the date of the enactment of this Act—may be commenced within whichever of the following periods is the shorter: (1) two years after the cause of action accrued, * * *;

" '(c) * * *.'

"The courts have held that a cause of action under the Fair Labor Standards Act for unpaid minimum wages or unpaid overtime compensation and for liquidating damages accrues when the employer fails to pay the required compensation for any workweek at the regular pay day for the period in which the workweek ends. Reid v. Solar Corp., D.C., 69 F.Supp. 626; Mid-Continent Petroleum Corporation v. Keen, 8 Cir., 157 F.2d 310. See also, Brooklyn Sav. Bank v. O'Neil, 324 U.S. 697, 65 S.Ct. 895, 89 L.Ed. 1296; Rigopoulos v. Kervan, 2 Cir., 140 F.2d 506, 151 A.L.R. 1126.

"An action is considered to be commenced under the Portal-to-Portal Act, Section 7, 29 U.S.C.A. § 256, on 'the date when the complaint is filed'. In this case where the proceeding is one of contempt, the action would be considered commenced on the date the petition was filed, which is January 17, 1950, thus limiting the action to violations which occurred subsequent to January 17, 1948."

The original complaint in this case was filed June 30, 1941. The judgment imposing the injunction upon the defendant was filed on November 2, 1942. The contempt petition was filed April 28, 1950. On the reasoning and authority of the Alma Mills case, recovery of any overtime wages prior to April 28, 1948, is barred. As a further indication of its intent to outlaw stale claims under the Fair Labor Stand-

474

ards Act, Congress on October 26, 1949, amended Sec. 217 of the Act to read as follows: "The district courts, together with the District Court for the Territory of Alaska, the United States District Court for the District of the Canal Zone, and the District Court of the Virgin Islands shall have jurisdiction, for cause shown, to restrain violations of section 215 of this title: Provided, *That no court shall have jurisdiction, in any action brought by the Administrator to restrain such violations, to order the payment to employees of unpaid minimum wages or unpaid overtime compensation or an additional equal amount as liquidated damages in such action.*" (Emphasis supplied.) 29 U.S.C.A. § 217.

▮ Under authority of McComb v. Jacksonville Paper Co., 336 U.S. 187, 69 S.Ct. 497, 93 L.Ed. 599, the court is required, upon a finding that defendant has violated the injunction of November 2, 1942, irrespective of whether or not the violation was wilful, to adjudge the defendant in civil contempt. In order to purge itself of contempt, the defendant should be required to pay to those employees heretofore found to be within the coverage of the Fair Labor Standards Act, such overtime wages as they would have been entitled to receive under the provisions of the Act. The parties have stipulated that in event of a finding that any of the employees were within the coverage of the Act, the parties will work out among themselves the amount of overtime wages to which the employee or employees may be entitled. This requirement that defendant make restitution of unpaid overtime wages is limited to the period subsequent to April 28, 1948.

▮ Under authority of McComb v. Jacksonville Paper Co., supra, the court is of the opinion that, in order further to purge itself of contempt, defendant should pay a compensatory fine sufficient to reimburse the petitioner for the cost and expenses of this litigation and of the investigatory work which was made prior to the filing of the contempt petition. The parties should be able to ascertain the amount required to meet the court's decision in this particular. However, the case will be re-

tained on the docket until all questions as to the amount of the judgment have been determined.

Let an order be prepared in accordance with this opinion.