Peter J. BRENNAN, Secretary of Labor,
United States Department of
Labor, Appellee,

v.

SCHWERMAN TRUCKING COMPANY
OF VIRGINIA, INC., a
corporation, Appellant.

No. 75–1279.

United States Court of Appeals,
Fourth Circuit.

Argued Oct. 9, 1975.

Decided May 12, 1976.

John J. McAleese, Jr., Bala Cynwyd, Pa.
(Roger D. Susanin, Palmerton, Pa., Cunniff,

Bray & McAleese, Bala Cynwyd, Pa., Goddin, Major, Schubert & Hyman, Richmond, Va., on brief), for appellant.

Jacob I. Karro, Atty., U. S. Dept. of Labor, Washington, D. C. (Marvin Tincher, Regional Atty., Nashville, Tenn., William J. Kilberg, Sol. Labor, Carin Ann Clauss, Associate Sol., and Paul D. Brenner, Atty., U. S. Dept. of Labor, Washington, D. C., on brief), for appellee.

Before RUSSELL and WIDENER, Circuit Judges, and WATKINS, District Judge.*

WIDENER, Circuit Judge:

This action was instituted by the Secretary of Labor against Schwerman Trucking Company of Virginia, Inc.,[1] a common carrier by motor vehicle engaged in the transportation of fertilizer, gasoline, jet fuel, diesel fuel, and other petroleum type products, to enjoin it from committing certain alleged violations of the Fair Labor Standards Act[2] (FLSA). Specifically, the Secretary contends that Schwerman is obliged under 29 U.S.C. §§ 215(a)(2) and 215(a)(5)[3] to compensate its drivers and mechanics in accordance with the maximum hours provisions of the FLSA.[4]

Schwerman claims that its drivers and mechanics are exempt from the maximum hours provisions by virtue of 29 U.S.C. § 213(b)(1) which provides in part:

"(b) The provisions of section 207 of this title [maximum hours] shall not apply with respect to—

(1) any employee with respect to whom the Interstate Commerce Commission has power to establish qualifications and maximum hours of service pursuant to the provisions of section 304 of Title 49 . . . ."

49 U.S.C. § 304(a) states in pertinent part that it "shall be the duty of the [Secretary] . . . to regulate common carriers by motor vehicle . . . and to that end [he] may establish . . . qualifications and maximum hours of service of employees, and safety of operation and equipment."

Pursuant to this authority, the Secretary has issued safety regulations governing the qualifications of drivers[5] as well as the management, maintenance and operation of motor vehicles employed by such common carriers.[6] In addition, the Secretary has made these regulations specifically applicable to motor carriers engaged in the transportation of hazardous materials.[7] As a

---

* Sitting by designation.

1. Schwerman Trucking Company of Virginia, Inc., as later explained, is a subsidiary of Schwerman Trucking Company, a Wisconsin corporation. The subsidiary may be hereinafter referred to as Schwerman.

2. 29 U.S.C. § 201 et seq.

3. Those provisions of 29 U.S.C. provide in part as follows:

"§ 215. *Prohibited acts; prima facie evidence*

(a) . . . it shall be unlawful for any person—

\* \* \* \* \* \*

(2) to violate any of the provisions of section 206 or section 207 of this title, or any of the provisions of any regulation or order of the Administrator issued under section 214.

\* \* \* \* \* \*

(5) to violate any of the provisions of section 211(c) of this title, or any regulation or order made or continued in effect under the provisions of section 211(d) of this title, or to

make any statement, report, or record filed or kept pursuant to the provisions of such section or of any regulation or order thereunder, knowing such statement, report, or record to be false in a material respect.

4. 29 U.S.C. § 207 of the Act states:

"(a)(1) Except as otherwise provided in this section, no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce for a workweek longer than forty hours, unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed . . . ."

5. 49 CFR, Part 391

6. 49 CFR, Part 392

7. 49 CFR, Part 397. Hazardous materials include such products as flammable liquids, including gasoline, jet fuel, and other petroleum products, the cartage of which the Secretary of

common carrier by motor vehicle,[8] Schwerman contends that its drivers and mechanics are subject to the control of the Secretary of Transportation to the exclusion of the Secretary of Labor.

While the district court agreed that Schwerman's drivers and mechanics were subject to the regulations of the Secretary of Transportation issued pursuant to his authority under 49 U.S.C. § 304, it was nevertheless of opinion that they were not exempt from the maximum hours provision of the FLSA. This determination was based upon the assumption that while Schwerman was engaged in some interstate cartage, that cartage was insufficient to bring it within the provisions of 29 U.S.C. § 213. Moreover, the district court was of the view that the fact that Schwerman held a Certificate of Convenience and Necessity issued by the Interstate Commerce Commission and maintained certain records required by the Department of Transportation was not sufficient to relieve the company of its obligations under the FLSA.

We do not agree with the holding of the district court. Based upon a review of the relevant statutory provisions involved, as well as the record, we are of opinion that the district court failed to give controlling weight to the power of the Secretary of Transportation to regulate Schwerman's employees and instead erroneously focused on the extent to which the firm engaged in interstate cartage. This does not give effect to the plain language of § 213. Consequently, the judgment of the district court is reversed.

Schwerman was formed in 1967, when its parent firm purchased the assets and operating authority of Petroleum Transit Corporation, a Virginia firm. Schwerman is a wholly owned subsidiary of Schwerman Trucking Company, a Wisconsin corporation with principal offices in Milwaukee, Wisconsin. Like its subsidiary, the parent corporation is a common carrier by motor vehicle engaged in the transportation of liquid and dry bulk products by tank truck. As of 1974, the parent had authority to operate in approximately 45 states and actually maintained 55 terminals in some 30 states located primarily in the eastern half of the United States. The ICC subsequently approved the purchase and granted temporary operating authority to Schwerman. On January 12, 1970, the ICC awarded Schwerman permanent operating authority and issued it a Certificate of Public Convenience and Necessity. That certificate authorized Schwerman to engage in transportation in interstate or foreign commerce from points in Virginia to points in North Carolina, West Virginia, the District of Columbia, Delaware, Maryland, Georgia, South Carolina and Tennessee.

Schwerman presently operates but one terminal facility, that being located at Norfolk, Virginia. Approximately one-half of Schwerman's drivers operate out of the Norfolk facility. The remainder of its drivers operate from Richmond, Virginia. Despite the fact that the company's drivers work from two separate locations, all of the firm's equipment is serviced in Norfolk. It is intermittently interchanged between the terminal and Richmond based upon the maintenance schedule and business needs.

In addition to its Norfolk facility, Schwerman maintained and operated a second terminal at Montvale, Virginia up through July 1969. From that location, it transported petroleum products to points in West Virginia. This cartage was authorized by the firm's interstate operating authority and was undertaken pursuant to an agreement with the American Oil Company.

Transportation is given specific authority to regulate under 18 U.S.C. § 834. We do not use the transportation of hazardous materials as an alternate ground for our decision as contended for by Schwerman. We express no opinion on the question for it is unnecessary to our holding. We do note that the Secretary of Transportation has described his authority to issue regulations concerning hazardous substances as 49 U.S.C. § 304 as well as 18 U.S.C. § 834.

8. A common carrier by motor vehicle is defined in 49 U.S.C. § 303(a)(14) as "any person [corporation] which holds itself out to the general public to engage in the transportation by motor vehicle in interstate or foreign commerce of passengers or property . . . ."

In 1969, American Oil terminated its relationship with Schwerman. This, in turn, precipitated the closing of the Montvale terminal. Despite the fact that the terminal has not since been operated, the company has retained ownership of the facility in hopes of reacquiring the American Oil account. In addition, Schwerman has refused throughout to sell its Montvale operating authority.

In order to preserve the validity of its interstate operating authority and in order to be in a position to utilize it whenever possible, Schwerman has regularly published, updated and filed a tariff booklet with the ICC setting forth the rates, rules and regulations applying to its transportation of products in interstate commerce. In addition, Schwerman has marked all of its equipment with decals showing the proper ICC authority identification numbers; it has filed its ICC operating authority with each State where its authority authorizes cartage; and it has filed the necessary fuel tax and motor vehicle registration with those States in which it was authorized to operate.

■ Thus, despite the curtailment of its interstate cartage occasioned by the loss of its American Oil account,[9] Schwerman has continued to maintain itself as legally qualified to carry products in interstate commerce and at all times relevant to this action has held itself out to the general public as available to engage in such cartage. Also, throughout this period, Schwerman has continuously solicited interstate business, although its efforts have met with no great success. We are nevertheless mindful of the fact that it is not simply those carriers who actually obtain interstate business that are subject to the jurisdiction of the Secretary of Transportation. *Starrett v. Bruce,* 391 F.2d 320, 323 (10th Cir. 1968), cert. den. 393 U.S. 971, 89 S.Ct. 404, 21 L.Ed.2d 384 (1968).

■ The success or failure of Schwerman's efforts to solicit interstate business is not the critical factor in determining whether the company is exempt from the provisions of the FLSA. Rather, the focus of inquiry must be upon whether the Secretary of Transportation has the "power to establish qualification and maximum hours of service" for Schwerman's employees. 29 U.S.C. § 213(b)(1). It is the existence of that power as opposed to its exercise which Congress has said is determinative as to the applicability of the FLSA. *Morris v. McComb,* 332 U.S. 422, 434, 68 S.Ct. 131, 92 L.Ed. 44 (1947); *Starrett* at 323. Based upon the facts presented here, as well as the applicable law, we are of opinion that such power was vested in the Secretary of Transportation.

9. The percentage of Schwerman's business which is interstate in nature is revealed by the following statistical breakdown:

REVENUE

| Year | % Interstate |
| --- | --- |
| 1967 | 9.7 |
| 1968 | 8.1 |
| 1969 | 1.2 |
| 1970 | 5.1 |
| 1971 | 1.5 |
| 1972 | 2.7 |
| 1973 | 3.3 |
| 1974 [first quarter] | 2.4 |

In *Morris v. McComb,* infra, the controlling case here, the revenue considered by the court as derived from interstate shipments was 4%. *Morris,* 332 U.S. at 427, 68 S.Ct. 131, 92 L.Ed. 44.

It should be noted that while the record may be somewhat less than clear, it appears that for the years 1971 through the first quarter of 1974, Schwerman's interstate cartage was not undertaken pursuant to the authority granted under its Certificate of Public Convenience and Necessity; rather, this cartage, which consisted almost entirely of the transportation of fertilizer from Norfolk to points in North Carolina, was apparently done under the operating authority owned by Schwerman's parent corporation. Whether the cartage was authorized by its own certificate or that of its parent is not, however, a controlling factor here, for, as is more fully set forth in the body of the opinion, it is not only the authority under which the carrier operates, but also what the carrier holds itself out to do which determines the power of the Secretary of Transportation to regulate the employees of the carrier. Accord, *Starrett v. Bruce,* 391 F.2d 320 (10th Cir. 1968), cert. den. 393 U.S. 971, 89 S.Ct. 404, 21 L.Ed.2d 384 (1968).

As has been noted, 49 U.S.C. § 304 states that it is the duty of the Secretary to regulate common carriers by motor vehicle. Section 303(a)(14) of that same title defines such a carrier as "any person [corporation] which holds itself out to the general public to engage in the transportation by motor vehicle in interstate or foreign commerce of passengers or property . . .." Thus, it is not what a corporation does but what it holds itself out to do that determines its status as a common carrier. *Starrett* at 323. In the instant case, Schwerman at all times relevant hereto held itself out as available for interstate cartage, solicited interstate business and handled any interstate shipments received. It was required to accept interstate freight offered at its going rates. As such, Schwerman falls squarely within the definition of a common carrier and is subject to regulation by the Secretary of Transportation. We are reinforced as to the soundness of this conclusion by the fact that the Secretary has already exercised this power by setting the qualifications and maximum hours of service of Schwerman's drivers. We are thus of opinion that the company is, by virtue of § 213(b)(1), exempt from the maximum hours provisions of the FLSA. A carrier may not be subjected simultaneously to the regulation of the Secretary of Transportation under the Motor Carriers Act and the Secretary of Labor under the FLSA. *Morris v. McComb*, 332 U.S. 422, 437–438, 68 S.Ct. 131, 92 L.Ed. 44 (1947); *Wirtz v. Caddell Transit Corp.*, 253 F.Supp. 378 (W.D. Okl.1966).

Having found that Schwerman comes within the exemption of 29 U.S.C. § 213(b)(1), the question remains whether the exemption extends to only the drivers or whether it extends to the mechanics. We are of opinion that it extends to the mechanics.

It appears from the record that when Schwerman receives a particular load for shipment, it is assigned to drivers operating out of either Norfolk or Richmond depending upon which is closer to the point of origin. Following the designation of a load, it is placed in a pool for selection by the individual drivers operating out of that particular area. The drivers then choose loads on the basis of seniority with the driver with the highest seniority having first choice as to which load or trip he desires each day. As a result, all trips, whether interstate of intrastate, are given to drivers on an indiscriminate basis. Schwerman's mechanics are similarly assigned work indiscriminately. All equipment, whether from Richmond or Norfolk and whether used in interstate or intrastate commerce is serviced on a regular basis at the Norfolk terminal.

Based upon these facts, we are of opinion that the decision in *Morris v. McComb*, 332 U.S. 422, 68 S.Ct. 131, 92 L.Ed. 44 (1947), again is controlling. There, the Court was concerned with a common carrier by motor vehicle that was engaged primarily in the local transportation of property for the general public. The carrier employed forty full time drivers and fourteen mechanics. Only four percent of its total business annually involved interstate cartage. The remaining ninety-six percent of the services provided by the carrier were intrastate in nature. Those interstate trips which were undertaken were found not to have been distributed equally among the company's drivers, and, in fact, two of the drivers had not engaged in any interstate transportation during the entire period in question. Moreover, an unspecified number of drivers made only one interstate trip a year and in many workweeks individual drivers were engaged solely in intrastate transportation.

Despite the small number of interstate hauls actually made and the unequal distribution among the firm's drivers of such hauls, the Court nevertheless found that the performance of such work was "shared indiscriminately by the drivers and was mingled with the performance of other like driving services rendered by them otherwise than in interstate commerce." 332 U.S. at 433, 68 S.Ct. at 136. Thus the Court concluded that athe ICC [10] had the power to

---

**10.** All powers formerly vested in the ICC were transferred to the Secretary of Transportation by Pub.L. 89–670, Oct. 15, 1966, 80 Stat. 931.

establish the qualifications and maximum hours of service for all the carrier's employees whose work activities affected the safety of operation of motor vehicles. This included those drivers who had not engaged in any interstate trips. The Court stated:

> "The net result is a practical situation such as may confront any common carrier engaged in a general cartage business, and who is prepared and offering to serve the normal transportation demands of the shipping public in an industrial metropolitan center. From the point of view of safety in interstate commerce, the hazards are not distinguishable from those which would be presented if each driver drove 4% of his driving time each day in interstate commerce. In both cases there is the same essential need for the establishment of respectable requirements with respect to qualifications and maximum hours of service of employees. If the common carrier is required, by virtue of that status, to take this interstate business he must perform the required service in accordance with the requirements established by the Commission." 332 U.S. at 434, 68 S.Ct. at 137.

While it may be that in the instant case few of Schwerman's regular drivers have actually engaged in interstate cartage as a result of the manner in which individual hauls are assigned,[11] we are nevertheless of opinion that the reasoning of the Court in *Morris* is no less applicable to the facts presented here. It is clear that the work of each of Schwerman's drivers may affect the safety of operation of motor vehicles engaged in interstate commerce. The fact that not all of Schwerman's employees work out of a single location (as was also the case in *Morris*) makes no difference in the result where work is assigned on an indiscriminate basis. See *Wirtz v. Caddell Transit Corp.*, 253 F.Supp. 378 (W.D.Okl. 1966). In either case, there is a need for the establishment of respectable require-

ments as to qualifications and hours of service.

The same reasoning applied to the drivers applies to the mechanics. "What is thus true for the driver is true also for the mechanic who repairs his truck." *Morris*, 332 U.S. at 432, 68 S.Ct. at 136. Their "work affects the safety of transportation," *Morris* at 431, 68 S.Ct. at 135, as surely as does that of the drivers. And *Morris* referred to *Ex Parte No. MC–2*, 28 M.C.C. 125 (1941), which had held that mechanics were subject to the regulations by the ICC (now the Secretary of Transportation). It follows that we are of opinion Schwerman's mechanics were also exempt from overtime pay under 29 U.S.C. § 213(b)(1).

The judgment of the district court is accordingly.

*REVERSED.*

---

11. The district court found that some interstate trips were made by contracting the work to other carriers.