Elaine L. CHAO, Secretary of Labor, United States Department of Labor, Plaintiff,

v.

FIRST CLASS COACH COMPANY, INC., Defendant.

No. 6:00–CV–1572–Orl–28JGG.

United States District Court, M.D. Florida, Orlando Division.

Oct. 1, 2001.

Ann G. Paschall, Robert L. Walter, U.S. Dept. of Labor, Office of the Solicitor, Atlanta, GA, for plaintiff.

Truett Scott Frazier, Terry & Frazier, LLP, Orlando, FL, Jeremy Kahn, Kahn and Kahn, Washington, DC, for defendant.

## ORDER

ANTOON, District Judge.

Elaine Chao, Secretary of Labor[1] ("DOL" or "the Secretary") brings the instant action against Defendant First Class Coach Company, Inc. ("First Class"), seeking an injunction and recovery of unpaid overtime compensation under the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. § 201, *et seq.* (hereinafter "the Act" or "the FLSA"). DOL contends that certain of First Class's employee drivers are not exempt from the overtime provisions of the Act and that First Class has violated the Act by not paying those drivers time and a half when they worked more than forty hours in a week. This court has jurisdiction pursuant to sections 16 and 17 of the FLSA (29 U.S.C. §§ 216 and 217) and 28 U.S.C. §§ 1331 and 1345.

---

1. This action was originally filed by Alexis Herman, the previous Secretary of Labor. Upon Ms. Chao's succession to the position of Secretary of Labor, she was automatically substituted as a party. *See* Fed.R.Civ.P. 25(d)(1) ("When a public officer is a party to an action in his official capacity and during its pendency dies, resigns, or otherwise ceases to hold office, the action does not abate and the officer's successor is automatically substituted as a party.").

This case is now before the court on cross-motions for summary judgment filed pursuant to Rule 56 of the Federal Rules of Civil Procedure.[2] As noted by the parties, the facts are undisputed and this case presents a narrow issue of law which is particularly appropriate for resolution by summary judgment. After considering the submissions of the parties, oral argument by counsel, and pertinent case law, the court concludes that the First Class employees in question are not entitled to overtime compensation under the FLSA, and hence First Class's motion for summary judgment will be granted and DOL's motion for partial summary judgment will be denied.

## I. *Factual Background*[3]

First Class is a transportation business that provides both intrastate and interstate bus service to its customers. The business maintains its headquarters in St. Petersburg, Florida, but also operates a facility in Orlando, Florida, where it employs drivers and other types of workers. First Class holds itself out to the public as providing ground transportation throughout the lower forty-eight states and Canada and belongs to national and international travel organizations. At least one of these organizations markets the availability of ground transportation in the territories it serves. Another such organization arranges package tours and, as a part of the packages, hires bus companies including First Class in particular cities to provide ground transportation for its customers. According to First Class, all of its transportation services fall into one of four broad categories: 1) out-of-town/out-of-state "charter" service; 2) "Amtrak" service; 3) local "transfer" service; and 4) local "scheduled" service.

The charter service may involve only intrastate travel. For instance, a group may hire First Class to drive a tour commencing and ending in Central Florida and never leaving the state. On the other hand, charter service may be part of an international or interstate tour where an out-of-state or foreign travel company contracts with First Class to provide ground transportation in Florida as a part of tours it has marketed to its customers. In these instances the tour companies, not the passengers, pay First Class for the exclusive use of its buses. First Class continually solicits charter business in cities outside of Florida, including Richmond, Virginia, Washington, D.C., and New York City. During 1999, First Class drove 10,336

2. First Class has filed Defendant's Motion for Summary Judgment (Doc. 19), Brief in Support of Defendant's Motion for Summary Judgment (Doc. 20), and Affidavit of Dale Puntel, General Manager, Defendant, First Class Coach Company, Inc., in Support of Defendant's Motion for Summary Judgment (Doc. 21), in response to which the Secretary has filed Plaintiff's Brief in Response to Defendant's Motion for Summary Judgment (Doc. 24). With leave of court (Docs. 54 and 55), First Class also filed Defendant's Supplemental Brief in Support of Motion for Summary Judgment (Doc. 56), in response to which the Secretary has filed Plaintiff's Reply to Defendant's Supplemental Brief (Doc. 59).

Additionally, the Secretary has filed Plaintiff's Motion for Partial Summary Judgment (Doc. 25) and Plaintiff's Brief in Support of Motion for Partial Summary Judgment (Doc. 26), in response to which First Class has filed Defendant's Brief in Opposition to Plaintiff's Motion for Summary Judgment (Doc. 38). With leave of court, the Secretary filed Plaintiff's Reply Brief in Support of Motion for Partial Summary Judgment (Doc. 32).

The court held oral argument on these motions on September 4, 2001. *See* Doc. 60.

3. As noted in the text, the parties agree that the facts are not in dispute. The facts cited in this Order are drawn from the affidavit filed by First Class's general manager, Dale Puntel, in support of First Class's summary judgment motion (Doc. 21).

charter trips in which it either drove across state lines or provided ground transportation as a component of tours originating out of state or out of country. Additionally, in 1999 First Class operated approximately 223 charter trips originating outside of Florida.

First Class's Amtrak service takes various forms. For instance, First Class charters buses to Amtrak to be used for intercity passenger transportation. This service provides transportation between cities where Amtrak has discontinued service. In addition to these connecting trips, First Class offers a daily "interline" bus service between the Amtrak station in Orlando and other cities located in Central and Southwestern Florida.[4] This service is available only to Amtrak customers arriving and departing from the Amtrak station in Orlando. Amtrak issues coupons to its ticket holders which allow them to use the interline service, and a passenger must present one of these coupons in order to use the service. The coupons are collected by First Class and submitted to Amtrak, which then pays First Class. Finally, from time to time First Class charters buses to Amtrak when Amtrak is unable to operate due to mechanical or other problems. This "substitute for rail" service sometimes requires First Class to transport passengers to other states. In 1999, First Class operated only four "substitute for rail" charters.

"Local transfer service" involves transportation of passengers between two points in Florida. Local transfer service includes three types of trips: (1) between Central Florida airports on one hand, and, on the other, local hotels or cruise ship docks throughout Central and South Florida; (2) between the same cruise ship docks on one hand, and, on the other, local hotels or airports; (3) between local hotels and local attractions. Over 75% of the passengers engaging in the local transfer service described in examples (1) and (2) purchase coupons as a part of an overall tour package sold by an out-of-state or foreign tour operator. For example, a cruise line might provide its customers with a package of travel documents, including coupons which would allow the traveler to use First Class transportation between the airport or hotel and the cruise ship. The coupons are included in the price of the cruise package, which is often sold by travel agents. Example (3) includes a percentage of travelers who have purchased a package tour to Central Florida which includes local ground transportation to local attractions provided by First Class.

"Local scheduled service" includes two types of routes: "Universal" and "I–Ride." "Universal" service is provided pursuant to a contract with a wholesale travel company which sells travel packages to customers visiting the Orlando area. The contract provides for First Class to operate a scheduled bus service from airports to hotels and between hotels and attractions. The contract also provides for service to cruise ship docks in Central and South Florida. The cost of this transportation is included in the tour packages, which are marketed and sold out of state. "I–Ride," on the other hand, is a scheduled trolley-bus service operating along the International Drive resort area near Orlando and Disney World. Many shops, restaurants and attractions catering to tourist traffic are located on International Drive. Payment for this transportation may be made in one of two ways. First, a passenger might pay the fare upon boarding the trolley. Second, a group may purchase tickets covering the cost for its members; these

---

**4.** Naples, Ft. Myers, Port Charlotte, Venice, Sarasota, Bradenton, St. Petersburg, Tampa, Lakeland, Winter Haven, Kissimmee, and Lake Buena Vista.

purchases are sometimes made out of state in advance of the riders' travels to the Orlando area. Indeed, although this is a local type of service, the overwhelming proportion of "I–Ride" users are out-of-state visitors, many of whom purchase their "I–Ride" tickets prior to arrival in Central Florida; DOL does not dispute First Class's evidence that at least 5–10% of the "I–Ride" tickets are sold out of state prior to the riders' travel to Orlando. The "I–Ride" service is provided pursuant to a contract between First Class and a local municipal taxing district.

Most transportation provided by First Class is within the State of Florida, but according to its unrebutted estimates, in 1997 First Class made 500 trips transporting travelers outside Florida. It also estimates that it made 600 trips out of state in 1998 and 675 such trips in 1999. According to First Class, at the time of the filing of its affidavits in support of its motion for summary judgment in 2000, its out-of-state transportation was continuing at a similar rate. In 1998, First Class had total revenue of $9,601,000, derived as follows:

| Type of Service | 1998 Revenue | % Total Revenue |
| --- | --- | --- |
| Charters and Transfers | $6,154,000 | 64% |
| Amtrak | $ 780,000 | 8% |
| I–Ride | $1,539,000 | 16% |
| Universal | $1,128,000 | 12% |

In 1999, there was an increase in revenue but little change in the sources from which the revenue was derived:

| Type of Service | 1999 Revenue | % Total Revenue |
| --- | --- | --- |
| Charters and Transfers | $7,742,000 | 64% |
| Amtrak | $ 803,000 | 7% |
| I–Ride | $2,028,000 | 17% |
| Universal | $1,498,000 | 12% |

During 1998, First Class employed an average of 114 drivers, and in 1999, it employed an average of 142 drivers. There is a relatively high turnover of drivers and therefore the total number of persons employed as drivers by First Class during these periods was actually higher.

When DOL began its investigation of First Class in July 1998, First Class operated 49 full-size intercity motor coaches with seating capacities of 47, 49, or 55 passengers; 9 trolley buses, each with a seating capacity of 33 passengers; and 3 mini-buses, each with a seating capacity of 29 passengers. By October 2000 the company had grown and there were 63 intercity coaches, 13 trolley buses, and 3 mini-buses.

The Interstate Commerce Commission (ICC) issued First Class a certificate in 1986 authorizing the company to operate in interstate and foreign commerce as a motor vehicle common motor carrier. The certificate remains in effect. As a result of its status as an interstate carrier, First Class is governed by the Federal Motor Carrier Safety Regulations ("MCSRs") at 49 C.F.R. pt. 390, *et seq.*, which are administered by the Department of Transportation ("DOT") (now by the Federal Motor Carrier Safety Administration pursuant to delegation by the DOT). The MCSRs set forth rules for driver qualification, including the requirements that drivers have commercial driver licenses, are medically fit, and test negative for alcohol and drugs. The MCSRs also prescribe the maximum hours which a driver may work per day and per week. Every First Class driver of every vehicle is subject to the MCSRs, including the regulations relating to "Qualifications of Drivers" at 49 C.F.R. pt. 391 and the "Hours of Service of Drivers" regulations at 49 C.F.R. pt. 395. Interstate carriers are required to subject their drivers to random drug and alcohol tests; First Class has required all of its drivers to take these tests, including those who have not driven interstate trips.

Like other interstate motor carriers, First Class is subject to periodic audits conducted by the DOT for compliance with the MCSRs. The DOT last audited First Class in November 1997 and reviewed,

among other things, First Class's compliance with regard to driver qualification and compliance with maximum work hours requirements. At no time did the DOT advise First Class that certain of its drivers were not subject to DOT jurisdiction for alcohol and drug testing. Furthermore, First Class asserts that at all times pertinent to this action all of its drivers have been properly qualified under the MCSRs, have held commercial driver licenses, and have satisfied the alcohol and drug testing requirements.

As a matter of company policy, every First Class driver becomes qualified and available to drive any type of trip, whether local, transfer, or out of state. Upon hire, First Class's drivers are told—and agree—that they may be called upon to drive any of First Class's routes, including routes that unquestionably qualify as interstate routes. Although new drivers are not always qualified to drive all First Class vehicles when hired, as they gain experience they are trained to drive full-size intercity charter coaches. Most drivers drive different types of trips at different times. Generally, new drivers are assigned local trips, but they are assigned out-of-state trips as they gain experience. This is consistent with the company's policy of promotion from within. On the other hand, "I–Ride" trolley drivers are expected to be available to drive to and from the airport immediately upon beginning work. Upon its investigation of First Class, DOL expressed concern that there were a small number of drivers who were not engaged in interstate travel and drove exclusively locally. Upon hearing DOL's concern, First Class began rotating its drivers then assigned to local "scheduled" routes to "charter" or "transfer routes." There remains a small number of drivers who wish to continue the local scheduled routes because of personal convenience. However, First Class insists that these drivers are

subject at any time to being assigned charter and Amtrak routes, as well as to being called to drive airport transfers; DOL concedes that all of these constitute interstate routes.

## II. Legal Discussion

### A. Summary Judgment Standards

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the burden of establishing that no genuine issues of material fact remain. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In ruling on a motion for summary judgment, "[t]he function of the court is not to 'weigh the evidence and determine the truth of the matter but to determine whether there is an issue for trial.'" *Lockett v. Wal–Mart Stores, Inc.,* 2000 WL 284295, *2 (S.D.Ala. Mar.8, 2000) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). As noted earlier, in the instant case the parties do not dispute the facts and they agree that the issue presented is a narrow legal question which is aptly resolved by summary judgment.

### B. The Merits of the Parties' Summary Judgment Motions

#### i. Pertinent Statutory Provisions

Both parties rely on the federal statutory scheme set forth in the FLSA regulating the compensation of employees. DOL's case is based upon the maximum hours or "overtime" provisions of Section 7 of the FLSA, which provides in relevant part:

Except as otherwise provided in this section, no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer than **forty hours** unless such employee receives compensation for his employment in excess of the hours above specified at a rate **not less than one and one-half times the regular rate** at which he is employed.

29 U.S.C. § 207(a)(1) (emphasis added). Thus, under this provision, employees engaged in commerce must be paid at least time and a half for time worked above forty hours in one week. Because the FLSA is remedial, it is to be broadly construed. *Antenor v. D & S Farms*, 88 F.3d 925 (11th Cir.1996).

However, there are exemptions from the requirements of this provision, including the exemption upon which First Class relies in the instant case pertaining to employees engaged in the transportation industry as drivers for motor carriers. This exemption provides, "The provisions of section 207 [maximum hours] of this title shall not apply with respect to ... any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of section 31502 of Title 49." 29 U.S.C. § 213(b)(1) (the "13(b)(1) exemption" or the "motor carrier exemption"). Section 31502 of Title 49, in turn, grants to the

Secretary of Transportation the power to regulate the qualifications and maximum number of hours for employees of motor carriers engaged in interstate transportation; this section provides in part:

§ 31502. Requirements for qualifications, hours of service, safety, and equipment standards

(a) Application.—This section applies to transportation—

(1) described in sections 13501 and 13502 of this title; and

(2) to the extent the transportation is in the United States and is between places in a foreign country, or between a place in a foreign country and a place in another foreign country.

(b) Motor carrier and private motor carrier requirements.—The Secretary of Transportation may prescribe requirements for—

(1) qualifications and maximum hours of service of employees of, and safety of operation and equipment of, a motor carrier; and

(2) qualifications and maximum hours of service of employees of, and standards of equipment of, a motor private carrier, when needed to promote safety of operation.

49 U.S.C. § 31502(a), (b).[5]

ii. *Analysis*

The question before the court is whether, under the statutory scheme described above, the 13(b)(1) motor carrier exemption to the FLSA's overtime provision applies to all First Class drivers. DOL

---

**5.** The transportation "described in section 13501" referenced in 49 U.S.C. § 31502(a)(1) pertains to interstate transportation; 49 U.S.C. § 13501 provides in part:

The Secretary [of Transportation] and the [Surface Transportation] Board have jurisdiction, as specified in this part, over transportation by motor carrier and the procurement of

that transportation, to the extent that passengers, property, or both, are transported by motor carrier—

(1) between a place in—
 (A) a State and a place in another State;
 (B) a State and another place in the same State through another State....

takes the position that the FLSA overtime exemption does not apply to First Class drivers who drive in its "I–Ride" service exclusively or for extended periods of time; although DOL initially contended that neither the "Universal" nor the "I–Ride" drivers were exempt from the overtime requirements, at oral argument DOL conceded that the Universal drivers drive interstate routes because part of the Universal service involves driving to airports and seaports. Hence, only the "I–Ride" drivers remain at issue.

First Class, on the other hand, argues that the actual routes of the drivers do not control the application of the overtime exemption but that the DOT's right to establish "qualifications and maximum hours of service" is determinative. First Class argues that regardless of whether all "I–Ride" drivers have recently driven interstate routes, First Class has made it clear to the drivers (and DOL) that they are subject to making such interstate trips upon request and that all of its drivers are exempt from the FLSA overtime requirements. Additionally, First Class contends that, although its "I–Ride" service is admittedly "more local" in nature than its other routes, the "I–Ride" service also constitutes interstate transportation by virtue of the fact that at least 5–10% of the "I–Ride" tickets are sold out of state as part of a package.

Under DOL regulations, in order to determine the applicability of the FLSA 13(b)(1) overtime exemption two questions must be answered: (1) Is the employer subject to the jurisdiction of the DOT? (2) Is the employee engaged in safety-related activities for a motor carrier in the interstate or foreign transportation of persons or property? 29 C.F.R. § 782.2.[6] Exemptions to the FLSA are to be construed strictly against the employer and in favor of the employee. *Mitchell v. Ky. Fin. Co.*, 359 U.S. 290, 79 S.Ct. 756, 3 L.Ed.2d 815 (1959). Furthermore, it is the burden of the employer to establish the applicability of the exemption. *Reich v. Am. Driver Serv., Inc.*, 33 F.3d 1153 (9th Cir.1994). DOL does not question the DOT's jurisdiction over First Class, nor does it challenge First Class's contention that all of its drivers are engaged in safety-related activity. However, DOL does argue that First Class has failed to establish that all "I–Ride" drivers operate in interstate transportation of persons.

a. *Is First Class Substantially Engaged in Interstate Transportation of Persons?*

■ There is no question that First Class is substantially engaged in interstate transportation of persons. It is not necessary that a company make a certain number or percentage of interstate trips in order to be engaged in interstate transportation of persons and under the power of the Secretary of Transportation. *Morris v. McComb*, 332 U.S. 422, 68 S.Ct. 131, 92 L.Ed. 44 (1947). The charter trips, Am-

---

**6.** This regulation provides in part:

The exemption of an employee from the hours provisions of the Fair Labor Standards Act under section 13(b)(1) depends both on the class to which the employer belongs and on the class of work involved in the employee's job. The power of the Secretary of Transportation to establish maximum hours and qualifications of service of employees, on which the exemption depends, extends to those classes of employees and those only who: (1)[a]re employed by carriers whose transportation of passengers or property by motor vehicle is subject to his jurisdiction under section 204 of the Motor Carrier Act, and (2) engage in activities of a character directly affecting the safety of operation of motor vehicles in the transportation on the public highways of passengers or property in interstate or foreign commerce within the meaning of the Motor Carrier Act.
29 C.F.R. § 782.2(a) (citations omitted).

trak trips, and local transfer trips involve interstate travel and have not been challenged by DOL as not being exempt from the FLSA overtime requirements. Additionally, DOL has now conceded that the Universal drivers also engage in interstate transportation.

Merely holding itself out as an interstate common carrier, which First Class unquestionably did, may have been enough to determine its status as an interstate motor carrier. *See Brennan v. Schwerman Trucking Co. of Va.,* 540 F.2d 1200, 1204 (4th Cir.1976). In any event, in addition to advertising itself as an interstate motor carrier, the company's substantial involvement in interstate transportation is evident in the number of interstate trips and the percentage of revenue gleaned from interstate travel, including charter trips across state lines. Trips which begin and end in Florida as part of interstate or international tours are also included under the heading of interstate travel if they are part of continuous interstate transportation of passengers. *See United Transp. Union Local 759 v. Orange Newark Elizabeth Bus, Inc.,* 111 F.Supp.2d 514 (D.N.J.2000); *see also Southerland v. St. Croix Taxicab Ass'n,* 315 F.2d 364 (3d Cir.1963).

However, again, DOL's challenge does not pertain to trips and drivers related to First Class's charter, Amtrak, local transfer, or Universal service, nor does it pertain to the DOT's jurisdiction over First Class in the first instance. Instead, DOL argues that First Class's "I–Ride" service is intrastate, not interstate, travel and therefore the FLSA overtime exemption does not apply to drivers who operate that route exclusively or for long periods of time. These drivers, asserts DOL, are entitled to overtime in accordance with the FLSA. Simply stated, DOL maintains that, notwithstanding First Class's substantial involvement in interstate travel, it should not be able to avoid payment of overtime wages to those drivers who are not involved in or reasonably expected to be engaged in driving interstate trips.

b. *Are All "I–Ride" Drivers Exempt From the Requirements of the FLSA Because They Operate In the Continuous Stream of Interstate Commerce?*

"Employers who claim that an exemption applies to their employees must show that the employees fit plainly and unmistakably within its terms." *Worthington v. Icicle Seafoods, Inc.,* 774 F.2d 349, 352 (9th Cir.1984), *cert. granted in part,* 474 U.S. 900, 106 S.Ct. 270, 88 L.Ed.2d 224 (1985), *and judgment vacated on other grounds,* 475 U.S. 709, 106 S.Ct. 1527, 89 L.Ed.2d 739 (1986). In the instant case, First Class may meet its burden as to the 13(b)(1) exemption by showing that the "I–Ride" route is operated in the continuous stream of interstate commerce, even though the route itself does not include out-of-state travel. *See, e.g., Southerland; United Transp.* If this is the case, the 13(b)(1) exemption applies to all First Class drivers and DOL is not entitled to enforcement of the FLSA overtime compensation provision.

Although DOL has now conceded that the "Universal" trips are entitled to interstate status because they are inextricably a part of continuous stream of interstate commerce even though the drivers do not leave the state when driving these routes, the discussion and reasoning of the cases cited and arguments made in the parties' submissions as to the Universal drivers is helpful to the resolution of the question of whether the "I–Ride" drivers also fall under the 13(b)(1) exemption. In discussing this point, First Class relies on *United Transportation Union Local 759 v. Orange Newark Elizabeth Bus, Inc.,* 111

F.Supp.2d 514 (D.N.J.2000). The issue in *United Transportation* was whether a transportation company's bus route that was driven entirely within the State of New Jersey, but which transported passengers to train stations and bus stations which then transported the same passengers to other states, entitled the company to the 13(b)(1) exemption. Under a New Jersey program, passengers could use the transportation company's pass for both bus and rail transportation out of the state using other carriers. This through-ticketing arrangement entitled a passenger to travel intrastate on the company's bus and interstate by bus or rail using other carriers. The intrastate transportation provided by the company was part of the interstate movement of passengers and therefore the 13(b)(1) exemption applied, even though only a small percentage of the passengers took advantage of the through-ticketing program allowing travel across state lines. *Id.* at 520.

The principle that intrastate travel may qualify as a legitimate part of interstate commerce is not new. In *United States v. Yellow Cab Co.*, 332 U.S. 218, 228, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947), *overruled on other grounds by Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984), the Court recognized that "[w]hen persons or goods move from a point of origin in one state to a point of destination in another, the fact that a part of that journey consists of transportation by an independent agency solely within the boundaries of one state does not make that portion of the trip any less interstate in character." Relying in part on the reasoning in *Yellow Cab*, the court in *Southerland v. St. Croix Taxicab Association*, 315 F.2d 364, 368 (3d Cir. 1963), observed that "there is no single concept of interstate travel that can be applied to every issue" and that with regard to what constitutes interstate travel

"[e]ach case must be viewed on its own peculiar facts." In *Southerland,* travel arrangements had been made for tourists visiting the Virgin Islands prior to their departure from the mainland. The prearranged travel included prepaid taxi transportation from the airport to the hotel upon arrival and back to the airport for departure. The court concluded that under these facts the taxi transportation was an "integral part of [the tourists'] all-expense interstate journey." 315 F.2d at 369. The same conclusion was reached in *Charter Limousine, Inc. v. Dade County Board of County Commissioners,* 678 F.2d 586 (5th Cir.1982), where the court held that prearranged limousine service provided for transportation of passengers arriving from out of state was within the stream of interstate commerce.

 As noted above, the transportation provided through the Universal package is in significant respects similar to the ground transportation discussed in *United Transportation, Southerland,* and *Charter Limousine.* The Universal package provided by a wholesale travel company and marketed outside the State of Florida provides ground transportation in the state as a component of the package. The service includes transportation between the hotels housing the tourists and the airport. As a part of the service, tourists also may travel to and from seaports where they may board cruise ships. The package also allows the tourists to use the service to visit local sites. Universal transportation is prearranged and purchased as a part of a tour package before the traveler leaves home. As now acknowledged by DOL, the Universal package thus is within the continuous stream of interstate travel and the drivers of these routes are covered by the 13(b)(1) exemption from the overtime provisions of the FLSA.

Nevertheless, DOL maintains that, notwithstanding the interstate nature of the Universal and other routes provided by First Class, the drivers who drive the "I–Ride" routes exclusively operate only within the State of Florida and because of the nature of the service are not within the stream of interstate commerce. Whether "I–Ride" routes are considered to be interstate travel is of particular significance because First Class admits that some "I–Ride" drivers have not driven other routes. Clearly, the "I–Ride" routes are more local in nature than the other First Class routes. "I–Ride" is essentially a scheduled trolley-bus service provided in a retail area in proximity to local theme parks and other attractions. Unlike the other First Class services, anyone may board the trolleys upon payment of the fare. If this were the extent of the service it would be difficult to argue in favor of its being a part of interstate commerce in and of itself.

However, there is another subset of "I–Ride" users that is relevant to resolution of this issue—groups intending to visit the Orlando area who purchase, out of state and in advance of their arrival, passes permitting the use of the "I–Ride" service. First Class contends that because the passes are marketed and sold to groups outside the state of Florida as a part of their travel plans the "I–Ride" routes are in the stream of interstate travel. First Class notes—and DOL does not contest—that at least 5–10% of the "I–Ride" tickets are purchased out of state in this manner.

Although DOL contends that the purchase of 5–10% of the "I–Ride" tickets out of state does not render the "I–Ride" service interstate transportation, the court agrees with First Class that such purchases of a portion of "I–Ride" tickets are sufficient to bring the "I–Ride" service within the category of interstate transpor-

tation and to render all "I–Ride" drivers exempt from the FLSA's overtime provisions. *See, e.g., United Transp.*, 111 F.Supp.2d at 519 ("The percentage of [defendant's] passengers who are using [bus passes which allowed interstate travel] is irrelevant. . . . [W]here an employer participates in a through-ticketing arrangement resulting in interstate travel, that employer is engaged in interstate transportation within the meaning of the FLSA and the MCSA."); *see also Morris* (finding that motor carrier overtime exemption applied to drivers and mechanics where 3% to 4% of carrier's business consisted of interstate commerce). For the purpose of the interstate transportation determination, the court finds no meaningful distinction between the through-ticket arrangement in United Transportation and the out-of-state sale and purchase of "I–Ride" tickets, and the undisputed sale of at least 5–10% of the "I–Ride" tickets in this manner is enough to bring those few drivers who have heretofore driven only "I–Ride" routes within the 13(b)(1) exemption. Accordingly, none of First Class's drivers are entitled to overtime under the FLSA and First Class is entitled to summary judgment.

c. *Are All "I–Ride" and "Universal" Drivers Exempt From the Requirements of the FLSA Because They Are Subject to Driving Interstate Routes?*

Even without the conclusion discussed above that the "I–Ride" route itself constitutes interstate transportation based on the out-of-state purchase of a portion of the "I–Ride" tickets, there is an alternative basis for concluding that all "I–Ride" drivers are within the 13(b)(1) exemption. As urged by First Class, this court finds that the fact that the "I–Ride" drivers are subject to being called upon to drive interstate routes at any time is also adequate to

exempt them from the FLSA's overtime provisions.

DOL concedes that a minimal connection with interstate commerce as a part of an employee's duties may be sufficient to bring the employee within the 13(b)(1) exemption. *See, e.g., Reich v. Am. Driver Serv., Inc.,* 33 F.3d 1153, 1155 (9th Cir. 1994) ("[E]ven a minor involvement in interstate commerce as a regular part of an employee's duties can subject that employee to the Secretary of Transportation's jurisdiction.") (citing *Morris v. McComb,* 332 U.S. 422, 432–35, 68 S.Ct. 131, 92 L.Ed. 44 (1947)). However, DOL, relying on *Reich,* asserts that a mere possibility of such interstate involvement in the future is not enough to effectuate the exemption and that an employee's failure to be engaged in interstate commerce for a period of four months would result in the employer losing the benefit of the exemption.

The reference to the four-month period noted in *Reich* and relied upon by DOL derives from a DOT notice of interpretation which provides in part: "Evidence of driving in interstate commerce or being subject to being used in interstate commerce should be accepted as proof that the driver is subject to 49 U.S.C. [§ ] 304 for a 4–month period from the date of the proof. The FHWA believes that the 4–month period is reasonable because it avoids both the too strict week-by-week approach and the situation where a driver could be used or be subject to being used once and remain subject to jurisdiction under 49 U.S.C. [§ ] 304 for an unlimited time." 46 Fed.Reg. 37,902, 37,903 (1981), *quoted in Reich,* 33 F.3d at 1156. Accordingly, DOL proposes that the exemption does not apply to those employees who have not been engaged in interstate commerce for a period of four months.

A close reading of *Reich* reveals that the opinion is not as helpful in the instant case

as suggested by DOL. This is because the four-month rule was applied to the activities of the employer and not the individual employees. The employer in *Reich* was a trucking company which contracted with a sugar company to transport sugar beets. Although the work done for the sugar company required some interstate trucking during the course of the harvesting season, during the first months of the season all of the company's travel was intrastate rather than interstate. Under those facts, the *Reich* court held that from the "beginning of each harvesting season continuing until one of its drivers actually engaged in interstate commerce, [the employer] was subject to the jurisdiction of the Secretary of Labor, and consequently, to the maximum hours provisions of the FLSA." *Id.* at 1157.

*Garcia v. Pace Suburban Bus Service,* 955 F.Supp. 75 (N.D.Ill.1996), is also instructive. In *Garcia,* the court addressed the question of application of the 13(b)(1) exemption to individual employees, recognizing that the exemption does not automatically apply to drivers who never drive interstate routes merely because an employer qualifies as an interstate motor carrier under the jurisdiction of the DOT and some of its employees drive interstate routes. Notwithstanding an employer's status as a motor carrier and the fact that the employer is otherwise involved in interstate commerce, one must also examine the activities of the individual driver to determine whether that driver is subject to FHA jurisdiction. *Morris v. McComb,* 332 U.S. 422, 68 S.Ct. 131, 92 L.Ed. 44 (1947). Relying on the same notice of interpretation (contained in 46 Fed.Reg. 37,-902, 37,903 (1981)) relied upon in *Reich,* the *Garcia* court found that DOT "jurisdiction extended only to those drivers who reasonably could be expected to make one of the carrier's interstate runs, and that

means more than a remote possibility." *Id.* at 77. This court agrees that the "reasonable expectation" test is appropriate and thus the question in the instant case becomes whether those "I–Ride" drivers who have not driven interstate routes in the past could be reasonably expected to drive such routes now or in the future.

In *Garcia*, the employer operated a strictly intrastate transportation service in the Chicago area but also operated a charter service and an airport service, both of which involved interstate transportation. The plaintiff in *Garcia* was a driver who had driven only intrastate routes and sought overtime compensation under the FLSA. As in the instant case, the issue was whether the employer was entitled to an exemption from the overtime requirements under 13(b)(1). In determining the applicability of the exemption, the court considered the fact that the plaintiff had not been called upon to drive interstate routes in the past. Of course, this factor alone weighed against enforcement of the exemption. However, the court's inquiry continued to take into account that: 1) upon hiring, the employer required the employee to sign a form acknowledging that he may be called upon to drive for the company's interstate charter service; 2) the employer required its drivers to comply with the Federal Motor Carrier Safety Regulations and maintain all DOT forms; 3) that the employer maintained its vehicles in accordance with ICC regulations; and 4) that the FHA regularly conducted audits in which it determined that all drivers were subject to federal safety requirements. After consideration of all of these factors, the *Garcia* court determined that the exemption applied and the plaintiff was not entitled to overtime pay under the FLSA.

Evidence that the 13(b)(1) exemption applies to First Class's drivers—including its "I–Ride" drivers—is equally persuasive. This evidence includes an oral agreement between First Class and its drivers at the time they are hired that they are expected to be able and available to drive all routes offered by the company. Although drivers are sometimes first assigned smaller vehicles driving local routes, they routinely move into larger vehicles driving longer routes as part of a typical progression within the company. Additionally, most drivers rotate the types of routes they drive.

First Class's efforts to comply with federal requirements for interstate drivers are also significant. The drivers become qualified to drive all types of vehicles used by the company for passenger transportation and are considered available to drive all routes including local tour, transfer, or out-of-state transfer. Assuring the drivers' qualifications to drive interstate routes, First Class maintains a "driver qualification file" for each driver as required by 49 C.F.R. § 391.51(a). These files show that drivers are qualified under MCSRs. Furthermore, all First Class drivers are subjected to random drug alcohol testing required by the MCSRs, and, to the extent required by MCSRs, First Class maintains driver's logs indicating the number of hours each driver works.

In fairness, it must be pointed out that in *Morris* and *Reich* the drivers were assigned to interstate routes indiscriminately. There was no discussion in the opinions as to what was meant by "indiscriminately," but it is suggested that it means that all drivers have an equal chance of being assigned to interstate routes. However, it is not likely that those courts intended indiscriminate assignment to serve as a bright-line test. The more germane question is whether there is other substantial evidence that the drivers in question are reasonably

expected to be involved in interstate commerce. First Class apparently did not assign its drivers indiscriminately. Indeed, it did try to honor the requests of a few employees that they be assigned only to local routes. For instance, First Class has tried to honor the requests of single mothers and injured employees to drive routes close to home. Nevertheless, there is nothing to rebut the assertion that these drivers might at any time be assigned a charter, an Amtrak route, or an airport transfer.

Finally, it is important to reiterate the percentage of drivers about whom DOL is concerned compared to First Class's overall operation. The undisputed evidence reflects that at most only a handful of "I–Ride" drivers have not driven routes which DOL concedes are interstate during the time period at issue. When considered in the context of all of First Class's nearly 150 drivers and thousands of interstate trips annually, it is obvious that First Class is substantially involved in interstate commerce. And again, even these few "I–Ride" drivers are subject—tomorrow or even today—to being called upon by their employer to drive an interstate route. Hence, even if the "I–Ride" service itself did not constitute interstate transportation as concluded earlier, all of the "I–Ride" drivers are exempt from the overtime provisions because the court finds that based on the undisputed record evidence even those few "I–Ride" drivers who have not driven other of First Class's routes in the past could be reasonably expected to drive such routes now or in the future.

### III. Conclusion

In sum, this court finds that all of First Class's drivers—including its "I–Ride" drivers—are exempt under the motor carrier exemption from the overtime provisions of the FLSA. By virtue of the advance, out-of-state sale of a portion of the "I–Ride" tickets, the "I–Ride" service constitutes interstate transportation in and of itself. Additionally, the court also concludes that based on the undisputed record evidence all "I–Ride" drivers are reasonably expected to drive other, concededly interstate routes for First Class and qualify for the motor carrier exemption on that independent basis as well. Accordingly, it is **ORDERED** and **ADJUDGED** as follows:

1. Defendant's Motion for Summary Judgment (Doc. 19) is **GRANTED.**

2. Plaintiff's Motion for Partial Summary Judgment (Doc. 25) is **DENIED.**

3. The Clerk is directed to enter judgment for Defendant First Class Coach Company, Inc. in accordance with this Order and thereafter to close the file.